**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| DIGITAL BACKGROUND CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:07-CV-00803-JPG-CJP |
| | ) | |
| APPLE, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO TRANSFER VENUE

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..........................................................................................................1

II.  STATEMENT OF MATERIAL FACTS.................................................................2

III.  ARGUMENT ..............................................................................................................4

A.  Standard For Transfer Of Venue Under 28 U.S.C. § 1404(a) .................................6

B.  The Suit Could Have Been Originally Filed In The Northern District Of California ..................................................................................................................6

C.  The Private Interest Factors Support Transferring This Litigation To The Northern District Of California ...............................................................................7

    1.  Plaintiff's Choice Of Forum Is Entitled To Less Deference Because It Is Not DBC's Home Forum And Has Minimal Connections With The Case..................................................................7

    2.  The Northern District Of California Would Be More Convenient Because Both Parties Reside In California ..................................................7

    3.  The Northern District Of California Would Be More Convenient Because A Majority Of Apple's Witnesses Reside There .........................8

    4.  Apple's Sources Of Proof Are More Easily Accessible In The Northern District Of California..................................................................10

    5.  The Northern District Of California Is The Situs Of The Material Events That Gave Rise To This Action ....................................................10

D.  The Public Interest Factors Support Transferring This Litigation To The Northern District Of California For The Convenience Of The Parties.................11

    1.  The Case Will Still Be Resolved Quickly And Efficiently If Transferred To The Northern District Of California ...............................11

    2.  The Northern District Of California Has A Much Stronger Interest And Connection With The Case And Is The Locale In Which This Controversy Should Be Resolved .............................................................12

IV.  CONCLUSION........................................................................................................13

## I.    INTRODUCTION

Defendant Apple Inc. ("Apple") respectfully moves the Court pursuant to 28 U.S.C. § 1404(a) to transfer venue of this civil action to the United States District Court for the Northern District of California, San Jose Division.  This Motion is supported by the Declaration of Bruce Arthur ("Arthur Decl.") and the Declaration of James F. Valentine ("Valentine Decl.").

Although Digital Background Corporation ("DBC") filed its patent infringement complaint in the Southern District of Illinois, DBC's choice of forum is entitled to little deference because it is not DBC's home forum.  *Plotkin v. IP Axess, Inc.*, 168 F. Supp.2d 899, 902 (N.D. Ill. 2001).  DBC is a Delaware-incorporated patent holding company headquartered in Newport Beach, California, with no known connection to this District aside from this lawsuit.

This District has no connection to the dispute underlying the case aside from the fact that Apple's software accused of infringement is available here – just as it is in every other judicial district.  But the mere fact that an accused product is available within a district does not warrant a finding that the case should be litigated there, especially when the district is significantly less convenient than another district.  *See*, *e.g.*, *Anchor Wall Sys., Inc. v. R & D Concrete Prods., Inc.*, 55 F. Supp.2d 871, 874 (N.D. Ill. 1999) ("Sales alone are insufficient to establish a substantial connection to the forum if the defendant's goods are sold in many states.").  Neither party to this litigation resides in this District or within 1,500 miles of it.  Rather, both parties reside in California.  In this case, the Northern District of California is by far the most convenient forum because, among other things, that is where the defendant and the bulk of the witnesses and documents are located.  It is also far more convenient for DBC than the Southern District of Illinois because DBC's headquarters are located in California.  DBC is a patent holding company that seeks to license intellectual property.  It has no known design facilities, manufacturing, or products.  It has no real business operations beyond its home office in California.  In contrast, Apple is a leader in innovation headquartered in Cupertino, California, which is within the Northern District of California. The Northern District of California is home to:  the design, development, and testing of the technology accused of infringement; the

1

witnesses knowledgeable about the design, development, and testing; the relevant documents and highly confidential Apple source code; the documents and likely witnesses relevant to the marketing and sales of the accused software; and at least one important third party witness. All of these factors factually make the Northern District of California the most convenient forum and legally the situs of the material events. *See*, *e.g.*, *Cooper Bauck Corp. v. Dolby Labs., Inc.*, 2006 U.S. Dist. LEXIS 44885, *16 (N.D. Ill. June 19, 2006) ("[I]n patent infringement cases, the location of the infringer's principal place of business is often the critical and controlling consideration because such suits often focus on the activities of the alleged infringer, its employees, and its documents.") (internal quotations omitted).

The public and private factors governing motions to transfer support a transfer to the United States District Court for the Northern District of California, San Jose Division. Just as courts in this district and other districts have concluded when confronted with similar facts, such a transfer would better serve the parties, the witnesses, and the judicial system.[1]

## II.    STATEMENT OF MATERIAL FACTS

DBC filed a complaint for patent infringement against Apple in the Southern District of Illinois. The asserted patent relates to removing and replacing background elements in video data. DBC's Complaint alleges that the backdrop feature of the iChat application of the Mac OS X v10.5 Leopard ("Leopard") operating system infringes the asserted patent. iChat is an application of the Leopard operating system that allows a user to text chat, audio chat, or video chat over the Internet without accruing any text messaging, long distance, or video streaming

---

[1]    As explained further below, when confronted with similar facts, courts in this district and other districts have found that a transfer is warranted. *See*, *e.g.*, *Forcillo v. LeMond Fitness Inc.*, 220 F.R.D. 550 (S.D. Ill. 2004) (finding that transfer was warranted when a Canadian plaintiff sued a defendant located in Washington for patent infringement, when all development work on the accused product occurred in Washington, and the only connection to the district was the sale of accused products, which were also available in other districts); *MLR, LLC v. Kyocera Wireless Corp.*, 2005 U.S. Dist. LEXIS 43895, *10-11 (N.D. Ill. April 6, 2005) (finding that transfer was warranted when both parties were headquartered in California, there was no indication that a disproportionately large number of the accused products were sold in Illinois, and plaintiff had no connection to Illinois beyond the lawsuit).

charges.  The backdrop feature, which was added to the October 2007 release of Leopard, is one of many new features of iChat and is only one of over 300 new features available in the Leopard operating system.  (Valentine Decl. ¶¶ 5, 6, Exs. 4, 5.)

The accused backdrop feature was conceived, designed, developed, tested, and readied for production at Apple's headquarters in Cupertino, California.  (Arthur Decl. ¶ 3.)  The pertinent documents and Apple's highly confidential source code are also located in Cupertino. (*Id.* at ¶ 6.)  Additionally, the relevant witnesses regarding the design and operation of the accused product reside in the Northern District of California.  (*Id.* at ¶¶ 3-5.)  Apple's only relevant connection to the Southern District of Illinois is the general availability of the accused product in this District.  Sales of the accused product in this District generally occur either through the Internet or through authorized resellers.[2]  (*Id.* at ¶ 7.)  But the accused product is sold nationwide,[3] and Apple has only two authorized sellers of the accused product in the Southern District of Illinois.  (Valentine Decl. ¶ 3, Ex. 2.)  In contrast, there are at least 32 authorized sellers of the accused product in or within 20 miles of San Jose, California.  (*Id.* at ¶ 4, Ex. 3.)

DBC is a Delaware corporation with its principal place of business in Newport Beach, California.  (Dkt. No. 2 at ¶ 6.)  DBC's Complaint lists DPMG, whose manager and sole organizer resides in Los Gatos, California, as the assignee of the patent.[4]  (*Id.* at ¶ 11.)  On information and belief, DBC's sole business is licensing intellectual property.  There is no evidence that DBC practices the claimed invention or offers any competing products in the Southern District of Illinois or elsewhere.  Nor has Apple had any licensing discussions with DBC in this District.  (Valentine Decl. ¶ 11.)  Apple is unaware of any DBC employees or

---

[2]  Apple also has a small number of sales representatives that sell Apple products nationwide directly to governmental and educational institutions.

[3]  *Id.*

[4]  Valentine Decl. ¶ 7, Ex. 6.  Los Gatos, California, is in the Northern District of California.

potential witnesses that reside in the Southern District of Illinois, or any DBC presence at all in this District.  DBC's sole connection to this District appears to be the present case against Apple.

## III.    ARGUMENT

DBC chose to file its complaint for patent infringement in the East St. Louis Division of the United States District Court for the Southern District of Illinois notwithstanding that this forum is remote to both parties, the potential material witnesses, and the relevant documents and materials.  This forum has no particularized nexus to the parties or the case, is not convenient for deciding this case, and is far less convenient than other forums.  Accordingly, DBC's decision to bring suit in the Southern District of Illinois is an exercise in forum shopping.  Allowing the case to remain in this district would impose unnecessary and unjustified burdens and expenses upon the parties and the Court.  The appropriate forum for this litigation is the United States District Court for the Northern District of California, San Jose Division.  The defendant, the relevant documents, and the relevant witnesses are located in that forum.

Similar patent infringement cases where neither party resides in the chosen forum and where all the development work occurred in another forum are routinely transferred by district courts in the Seventh Circuit.  This is especially true when, as in this case, the transferee forum would be more convenient for both parties.  *See, e.g.*, *MLR*, 2005 U.S. Dist. LEXIS 43895 at *4; *Cooper Bauck*, 2006 U.S. Dist. LEXIS 44885 at *16; *Anchor Wall*, 55 F. Supp.2d at 874.  One example from this District is *Forcillo v. LeMond Fitness Inc.*, 220 F.R.D. 550 (S.D. Ill. 2004), a patent case that was transferred to the Western District of Washington.  In *Forcillo*, the plaintiff, a citizen of Canada, filed a patent infringement suit against the defendant, a corporation incorporated in Delaware and headquartered in Washington.  *Forcillo*, 220 F.R.D. at 551.  The defendant moved to transfer the case to the Western District of Washington under 28 U.S.C. § 1404(a).  *Id.*  In analyzing the private interest factors for transferring venue, the Court first noted that the plaintiff was not a resident of the District, *id.* at 552, and found that the Western District of Washington was the situs of material events because it was where the accused product

4

was "designed, tested, and readied for production," while only sales of the accused products occurred in Illinois. *Id*. at 554. The Western District of Washington was also found to be more convenient for the parties, due to the fact that if the litigation stayed in Illinois, both parties would have had to travel, whereas if the case was transferred, only the plaintiff would have to travel. *Id*. at 554. The Court also noted that many of the essential witnesses lived in the Western District of Washington. *Id*. at 553. In resolving the public interest factors, the Court noted that the time from filing to disposition was faster in Washington and that, under the facts of the case, it was likely that no delay would result from a transfer. *Id* at 554. When all of these factors were considered, the Court granted the motion to transfer finding that it would serve "the convenience of parties and witnesses as well as promote the interest of justice." *Id*.

As further explained below, the facts in this case show that the interests of convenience and justice would best be served by transferring this case, just as in *Forcillo*. Neither party resides in DBC's chosen forum of the Southern District of Illinois. (Dkt. No. 2 at ¶ 6; Arthur Decl. ¶ 2.) Apple has identified essential witnesses that reside in the Northern District of California and is unaware of any relevant witnesses located in the Southern District of Illinois. (Arthur Decl. ¶¶ 3-5.) The allegedly infringing feature of the accused product was designed, tested, and readied for production in the Northern District of California. (*Id*. at ¶ 3.) Transfer is more convenient for the parties because both reside in California. As for the public interest factors, the median time of disposition for civil cases is slightly less in the Northern District of California than in the Southern District of Illinois. (Valentine Decl. ¶ 2, Ex. 1.) Thus, under the facts of this case, it is very unlikely that there would be any significant delay in the litigation.[5] When similar facts were considered in *Forcillo*, the Court transferred the case for the convenience of the parties and in the interest of justice. A transfer of this case to the Northern District of California is warranted as well.

---

[5]    Nor would DBC be prejudiced even if a transfer delays resolution of this action. DBC has no business that competes with Apple and is interested only in receiving monetary compensation. Interest on any monies ultimately awarded to either party would adequately compensate that party for any delay.

A.      **Standard For Transfer Of Venue Under 28 U.S.C. § 1404(a)**

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (2006).  The moving party bears the burden of demonstrating that a transfer of venue is warranted.  *Forcillo*, 220 F.R.D. at 552.  The decision to transfer venue is within the Court's discretion which is to be exercised in light of the particular circumstances of each case based on fairness and convenience.  *Id.*

As a threshold issue, this Court must determine whether DBC's claim could have been filed in the United States District Court for the Northern District of California, San Jose Division, where Apple seeks to have the action transferred.  *Id.*

Once Apple establishes that DBC could have filed this action in the United States District Court for the Northern District of California, this Court must evaluate a number of factors which focus on the convenience of the litigants (the "private interest factors") and the public interest in the fair and efficient administration of justice (the "public interest factors").  *Id.*  The private interest factors include:  (1) the plaintiff's choice of forum, (2) the location of the parties and witnesses, (3) the ease of access to sources of proof, and (4) the situs of material events.  *Id.*  The Court must also consider the following public interest factors:  (1) the Court's familiarity with the applicable law, (2) the speed at which the case will proceed to trial, and (3) the relation of the community to the occurrence at issue and the desirability of resolving controversies in their locale.  *Amoco Oil Co. v. Mobil Oil Corp.*, 90 F. Supp.2d 958, 961-62 (N.D. Ill. 2000).

B.      **The Suit Could Have Been Originally Filed In The Northern District Of California**

Because Apple's primary place of business is in Cupertino, California,[6]  Apple is subject to personal jurisdiction in the Northern District of California.  Consequently, venue is also proper in that District.  *MLR*, 2005 U.S. Dist. LEXIS 43895 at *4 ("In a patent case, venue is proper in a district if that district can exercise personal jurisdiction over the defendant.").

---

[6]    Arthur Decl. ¶ 2.

**C.    The Private Interest Factors Support Transferring This Litigation
To The Northern District Of California**

As explained below, each of the private interest factors weighs in favor of transferring this case to the Northern District of California, San Jose Division.

**1.    Plaintiff's Choice Of Forum Is Entitled To Less Deference
Because It Is Not DBC's Home Forum And Has Minimal
Connections With The Case**

Although DBC's choice of forum would ordinarily be entitled to deference, "where the plaintiffs' chosen forum is not the plaintiffs' home forum or lacks significant contact with the litigation, the plaintiffs' chosen forum is entitled to less deference." *Plotkin*, 168 F. Supp.2d at 902.  In this case, neither the plaintiff nor the defendant resides in this District.  (Dkt. No. 2 at ¶ 6; Arthur Decl. ¶ 2.)  Both parties reside in California.  And while plaintiff's counsel may reside in this District, the location of plaintiff's counsel is not considered in the Court's transfer analysis.  *Forcillo*, 220 F.R.D. at 552.  The only connection between this litigation and the Southern District of Illinois is that the accused products are generally available there.  Because the accused product is sold nationwide,[7] however, this fact is not enough to establish a "substantial" connection to the Southern District of Illinois.  *Anchor Wall*, 55 F. Supp.2d at 874 ("Sales alone are insufficient to establish a substantial connection to the forum if the defendant's goods are sold in many states.").  Because the Southern District of Illinois is not the resident forum of DBC and has only a minimal connection with this case, DBC's choice of this forum should be afforded less deference.

**2.    The Northern District Of California Would Be More
Convenient Because Both Parties Reside In California**

Because both parties reside in California, the Northern District of California would be a more convenient forum.  If this case is transferred, neither company will be forced to leave its home state in order to litigate the case.  Apple would not have to travel, and DBC, being a

---

[7]    Arthur Decl. ¶ 7.

DM_US:21008621_1

Southern California company, would need approximately 1-2 hours by plane to reach the forum. If the case is not transferred, both parties would be forced to travel 1,500 miles to reach the forum, which would require an entire day due to the distance and two time zones that must be traversed.  Because a transfer to the Northern District of California would afford both parties the convenience of litigating in their home state and would significantly decrease travel time and expenses, this factor weighs heavily in favor of transfer.

3.     **The Northern District Of California Would Be More Convenient Because A Majority Of Apple's Witnesses Reside There**

Given the number of Apple witnesses that reside in the Northern District of California, the cost of attendance for those witnesses at trial will be greatly decreased if the case is transferred.   The two Apple engineers who designed and developed the accused iChat backdrop feature reside in the Northern District of California.  (Arthur Decl. ¶ 4.)  Apple anticipates calling them as witnesses at trial because they have exclusive knowledge of how the code was designed and how its features operate.  Because these two witnesses are key to explaining how the accused product operates, their convenience alone is enough to warrant a transfer to the Northern District of California.  *See Moore v. AT&T Latin Am. Corp.*, 177 F. Supp.2d 785, 790 (N.D. Ill. 2001) ("One key witness for one party can outweigh many less important witnesses for the other party.")   The two Apple employees involved with marketing the accused iChat backdrop feature also reside in the Northern District of California.  (*Id.* at ¶ 5.)  Although Apple has specifically identified several witnesses, along with a description of their relevant knowledge, it should also be noted that almost all of the domestic employees involved with the accused iChat backdrop feature, including software support and marketing, work at Apple's headquarters in the Northern District of California.  (*Id.* at ¶ 3.)  Therefore, any Apple employee who has relevant testimony regarding the backdrop feature is likely to reside in Northern California as well.

8

Courts also consider the presence of non-party witnesses in other forums. *MLR*, 2005 U.S. Dist. LEXIS at *7. DBC's Complaint identifies DPMG as the assignee of the patent. (Dkt. No. 2 at ¶ 11.) Bruce Renouard, a resident of Los Gatos, California, in the Northern District of California, is listed as the manager and sole organizer of DPMG. (Valentine Decl. ¶ 7, Ex. 6.) Given the confusion over the assignment of the patent-in-suit, Mr. Renouard's testimony regarding the assignment of the patent both to and from DPMG may be important to Apple's case. Because Mr. Renouard resides outside the subpoena power of this Court, and could not be compelled to testify if the case were to remain in Illinois, the ability of a court in the Northern District of California to compel Mr. Renouard's testimony is another fact supporting transfer. *Cooper Bauck*, 2006 U.S. Dist. LEXIS at *19 ("When considering this factor . . . the court may consider whether the witnesses can be compelled to testify.").

Apple is not aware of any potential witnesses who reside in the Southern District of Illinois, nor has DBC identified any in its Complaint. Apple has identified witnesses, both employee and third party, residing in the Northern District of California. (Arthur Decl. ¶ 4.) Litigating in the Southern District of Illinois would require Apple's employee witnesses to spend a day traveling to Illinois. Productivity at Apple would suffer due to the extra day these witnesses would spend traveling to proceedings in this District. Apple would be further burdened because it would have to pay for these witnesses' airfare, hotel, and meals during this time. Transferring the case to the Northern District of California would avoid these burdens. *See Anchor Wall*, 55 F. Supp.2d at 875 ("Because a transfer would minimize disruption of its plant's operations and eliminate all of its travel expenses, without significantly increasing the burden on the patentee, . . . the overall convenience of the witnesses will be increased by a transfer of this lawsuit."). Because the convenience of the witnesses is the most important factor in analyzing a motion to transfer, this factor weighs heavily in favor of transferring this case to the Northern District of California. *Forcillo,* 220 F.R.D. at 552 ("[T]he convenience of the witnesses . . . is the most important factor in the transfer balance.").

9

4.      **Apple's Sources Of Proof Are More Easily Accessible In The Northern District Of California**

"In a patent infringement case, practicality and convenience are best served when [the action] is prosecuted where the alleged acts of infringement occurred and the defendant has a regular and established place of business so as to facilitate the production and investigation of books, records and other data necessary to the discovery and trial techniques employed in the patent field." *Anchor Wall*, 55 F. Supp.2d at 875.  In this case, the allegedly infringing feature of the accused product was designed, developed, and tested at Apple's principal offices in Cupertino, California.  (Arthur Decl. ¶ 2.)  Thus, the majority of the relevant documents and records in Apple's possession concerning the design, operation, and marketing of the accused product will be found in Cupertino.  (*Id.* at ¶ 5.)

By contrast, Apple does not store any relevant documents in the Southern District of Illinois.  (*Id.*)  In fact, Apple is not aware of any sources of proof that exist in the Southern District of Illinois.  Therefore, the relative ease of access to sources of proof weighs in favor of a transfer of venue to the Northern District of California.

5.      **The Northern District Of California Is The Situs Of The Material Events That Gave Rise To This Action**

The Southern District of Illinois has a *de minimis* connection with the operative facts giving rise to the alleged infringement by Apple, while the Northern District of California has a much greater connection.  In patent cases, this factor focuses on "the alleged infringing activities of the defendant and the employees and documents that evidence these activities, and the situs of the material events generally is where the alleged infringing activities occurred." *Forcillo*, 220 F.R.D. at 554.  The simple fact that Apple's principal place of business is in the Northern District of California makes this factor weigh heavily in favor of transfer. *See Cooper Bauck*, 2006 U.S. Dist. LEXIS 44885 at *16 ("[I]n patent infringement cases, the location of the infringer's principal place of business is often the critical and controlling consideration because such suits often focus on the activities of the alleged infringer, its employees, and its

10

documents.") (internal quotations omitted). Sales of the accused product in this District – which are not disproportionate in comparison to sales in other districts[8] – are generally made only through the Internet or authorized resellers. (Arthur Decl. at ¶ 7.) Because almost all of the material events occurred in the Northern District of California, as explained above, this factor weighs heavily in favor of transfer. *See Forcillo*, 220 F.R.D. at 554 (finding that the "situs of material events" factor weighed in favor of transfer under similar facts); *Anchor Wall*, 55 F. Supp.2d at 874 ("R&D designed, manufactured, stored, and sold the alleged infringing masonry blocks in Rock Island. Conversely, only limited sales activities actually occurred in this district. Because there is little connection between this district and the litigation, the situs of material events factor favors transfer. . . .").

### D. The Public Interest Factors Support Transferring This Litigation To The Northern District Of California For The Convenience Of The Parties

As analyzed below, the public interest factors also weigh in favor of transferring this case to the Northern District of California, San Jose Division.

#### 1. The Case Will Still Be Resolved Quickly And Efficiently If Transferred To The Northern District Of California

United States government statistics show that the case will likely be resolved just as quickly and efficiently in the Northern District of California as it would be in this forum. According to these statistics, during the 12-month period ending March 31, 2007, cases resolved "Before Pretrial" in the Southern District of Illinois had a median length of 8.6 months. (Valentine Decl. ¶ 2, Ex. 1.) Cases resolved "During or After Pretrial" had a median length of 16.4 months, and the 17 cases resolved at "Trial" had a median length of 20.5 months. (*Id.*) The

---

8    Apple does not keep track of sales by judicial District. However, there are only two authorized sellers of the accused product in the Southern District of Illinois. (Valentine Decl. ¶ 3, Ex. 2.) In stark contrast, there are at least 32 authorized sellers of the accused product within 20 miles of the city of San Jose. (Valentine Decl. ¶ 4, Ex. 3.) This indicates that the accused product is not only more readily available in the Northern District of California, but also that there are likely to be more sales there as well.

median time to disposition for all civil cases was 8.1 months. (*Id.*) In comparison, in the Northern District of California, cases resolved "Before Pretrial" had a median length of 6.8 months; cases resolved "During or After Pretrial" had a median length of 12.4 months; and the 53 cases resolved at "Trial" had a median length of 27 months. (*Id.*) The median time to disposition for all civil cases was 6.1 months. (*Id.*) These times are all comparable to the median times in the Southern District of Illinois, and a transfer to the Northern District of California will not delay resolution of the case.[9] Moreover, because DBC has no business that competes with Apple and exists only to collect licensing revenues, neither party would be prejudiced even if a transfer did cause delay. Interest on any monies collected by either party would adequately compensate that party for any delay. Accordingly, this factor does not weigh against a transfer.

> **2.    The Northern District Of California Has A Much Stronger Interest And Connection With The Case And Is The Locale In Which This Controversy Should Be Resolved**

Because Apple's activities concerning the accused products occurred almost entirely in the Northern District of California, it should be considered the "locale" of this controversy. *Cooper Bauck*, 2006 U.S. Dist. LEXIS at *23 ("The controversy in patent infringement actions typically centers on where the defendant's activities occurred."). As previously explained, California is the situs of the material events in this case and plaintiff's and defendant's principal place of business. (Dkt. No. 2 at ¶ 6.) Both parties in this case have very strong connections to California, and California has a strong interest in this litigation. In contrast, beyond the general availability of the accused product, Illinois has no connection to or interest in this case. Because the accused product is available in both Illinois and California, and the work on the accused

---

[9] The Northern District of California also has specialized local patent rules used to facilitate proceedings in patent cases. These specialized rules require complete disclosures of positions from all parties and help ensure that the proceedings stay on schedule. (Valentine Decl. ¶ 8, Ex. 7.) This is yet another reason why there is no reason to believe that transferring this case would cause any delay.

product occurred in the Northern District of California, this factor weighs heavily in favor of transfer. *See Cooper Bauck*, 2006 U.S. Dist. LEXIS at *23-24 (holding that this factor weighed in favor of transfer because "the research, development, patenting, implementation, testing, marketing and licensing of the accused infringing technology" occurred in California and because California shared Illinois's interests in preventing infringing sales since the accused product was sold in both forums); *MLR*, 2005 U.S. Dist. LEXIS at *10-11 (finding that California had a stronger interest in the patent case than Illinois because both parties were headquartered in California, there was no indication that a disproportionately large number of the accused products were sold in Illinois, and plaintiff had no connection to Illinois beyond the lawsuit.).

## IV.    CONCLUSION

A transfer of venue to the San Jose Division of the United States District Court for the Northern District of California is warranted under 28 U.S.C. § l404(a). DBC's choice of the Southern District of Illinois as a forum for this litigation is entitled to little deference because DBC does not reside there and because the operative facts of this case have almost no connection to Illinois. All of the other private interest factors weigh in favor of a transfer. Each of the public interest factors also weighs in favor of a transfer. None of the factors weigh against a transfer. Accordingly, Apple respectfully requests that the Court grants Apple's motion to transfer these proceedings to the Northern District of California, San Jose Division.


Dated:  February 6, 2008              By:    /s/ James F. Valentine
                                          Henry C. Bunsow (admitted *pro hac vice*)
                                          California State Bar No. 60707
                                          James F. Valentine (admitted *pro hac vice*)
                                          California State Bar No. 149269
                                          Jason T. Anderson (admitted *pro hac vice*)
                                          California State Bar No. 212938
                                          Ryan J. Moran (admitted *pro hac vice*)
                                          California State Bar No. 244447
                                          Christina M. Finn (admitted *pro hac vice*)

13

California State Bar No. 247838
HOWREY LLP
1950 University Avenue, 4th Floor
East Palo Alto, CA 94303
Telephone: 650.798.3500
Facsimile: 650.798.3600
E-mail: BunsowH@howrey.com
E-mail: ValentineJ@howrey.com
E-mail: AndersonJ@howrey.com
E-mail: MoranR@howrey.com
E-mail: FinnC@howrey.com

Joseph P. Conran
joe.conran@husch.com
Dutro E. Campbell
bruce.campbell@husch.com
HUSCH & EPPENBERGER, LLC
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Telephone: 314.480.1500
Facsimile: 314.480.1505

Attorneys for Defendant and
Counterclaimant APPLE INC.

14

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| DIGITAL BACKGROUND CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:07-CV-00803-JPG-CJP |
| | ) | |
| APPLE, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF BRUCE ARTHUR
IN SUPPORT OF MOTION OF APPLE INC. TO TRANSFER VENUE**

I, Bruce Arthur, declare as follows:

1.      I am employed as an Engineering Manager at Apple Inc. ("Apple") in Cupertino, California.  I manage Apple employees involved in the design and engineering of the following applications of the Mac® OS X v10.5 Leopard ("Leopard") operating system:  iChat, Photo Booth, iCal, Mail and Address Book.  I have been employed with Apple since 1997.  I provide this declaration in support of Apple's motion to transfer this case from the Southern District of Illinois to the Northern District of California.  Unless otherwise indicated below, the statements in this declaration are based upon my personal knowledge or corporate records maintained by Apple in the ordinary course of business.

2.      Apple is a California corporation headquartered in Cupertino, California.  Apple designs, manufactures, and markets personal computers, portable digital music players, and mobile communication devices and sells a variety of related software, services, peripherals, and networking solutions.

3. The backdrop feature of the iChat application of the Leopard operating system (which I understand to be a focus of plaintiff's lawsuit) was conceived, designed, developed, tested, and readied for production at Apple's headquarters in Cupertino, California. The numerous Apple employees involved in the development, engineering, marketing, analysis, and business decisions related to the iChat backdrop feature are based in Cupertino, California. Thus, nearly all potential Apple witnesses of whom I am aware concerning the conception, design, development, and ongoing support of the backdrop feature and who reside in the United States are located in Northern California.

4. The key Apple software engineers involved in the design and development of the backdrop feature are Chendi Zhang and Michael Stochosky. Messrs. Zhang and Stochosky reside in Northern California.

5. The main Apple marketing employees involved in the development and marketing of the backdrop feature are Kurt Knight and Ronak Shah. Messrs. Knight and Shah reside in Northern California.

6. The vast majority of Apple's electronic and hard-copy documents related to the design and development of the backdrop feature, including Apple's highly confidential source code, are located at Apple's headquarters in Cupertino, California. Documents related to the marketing of the Leopard operating system are located in Cupertino as well. I am aware of no relevant documents that are located in the Southern District of Illinois.

7. The Leopard operating system is sold nationwide. I am informed and believe that sales of the Leopard operating system in the Southern District of Illinois generally occur through authorized resellers or the Internet. I am informed and believe that Apple does not have any retail stores in the Southern District of Illinois.

2

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  February 5, 2008

By: _____
     Bruce Arthur

3

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| DIGITAL BACKGROUND CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:07-CV-00803-JPG-CJP |
| | ) | |
| APPLE, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JAMES F. VALENTINE**
**IN SUPPORT OF MOTION OF APPLE INC. TO TRANSFER VENUE**

I, James F. Valentine, declare as follows:

1.    I am an attorney with the law firm of Howrey LLP, counsel of record for Defendant in the above-entitled action.  I am duly licensed in the State of California.  Except where otherwise indicated, I make this declaration based on my personal knowledge, the record in this action, and matters of public record.  If called upon as a witness, I could and would testify competently as to the matters set forth below.

2.    A true and correct copy of a table entitled "U.S. District Courts – Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending March 31, 2007," which was downloaded from the United States Courts website at http://www.uscourts.gov/caseload2007/tables/C05Mar07.pdf on February 4, 2008, is annexed hereto as Exhibit 1.

3.    Using Apple's website, http://www.apple.com/buy, a search was performed on February 4, 2008 to locate the authorized resellers of the accused product in the Southern District of Illinois.  This search revealed that only two authorized Macintosh resellers were located in the Southern District of Illinois.  A true and correct copy of the results of the search, with the authorized Macintosh resellers in the Southern District of Illinois circled and highlighted, is annexed hereto as Exhibit 2.

4.    Using Apple's website, http://www.apple.com/buy, a search was performed on February 4, 2008 to locate the authorized resellers of the accused product in or near San Jose, California, which is located in the Northern District of California.  This search revealed at least 32 authorized Macintosh resellers within 20 miles of the city of San Jose.  A true and correct copy of the results of the search is annexed hereto as Exhibit 3.

5.    I am informed and believe that over 300 new features were added to the Mac OS X v10.5 ("Leopard") operating system.  Among other things, the basis for this belief is a list of over 300 features added to the Leopard operating system, which was downloaded from Apple's website at http://www.apple.com/macosx/features/300.html on February 4, 2008.  A true and correct copy of this list of new features is annexed hereto as Exhibit 4.

1

6.    True and correct copies of excerpts from Apple's Form 10-K dated November 15, 2007 are annexed hereto as Exhibit 5.

7.    A true and correct copy of a document entitled "Articles of Organization of Digital Property Management Group, LLC," ordered from the Texas Secretary of State on January 31, 2008, is annexed hereto as Exhibit 6.  The document lists Bruce T. Renouard of Los Gatos, California, as the manager and sole organizer of Digital Property Management Group, LLC.  Los Gatos, California, is within the Northern District of California.

8.    A true and correct copy of the current Local Rules of Practice for Patent Cases before the United States District Court for the Northern District of California is annexed hereto as Exhibit 7.

9.    A true and correct copy of *Cooper Bauck Corp. v. Dolby Labs., Inc.*, 2006 U.S. Dist. LEXIS 44885 (N.D. Ill. June 19, 2006) is annexed hereto as Exhibit 8.

10.    A true and correct copy of *MLR, LLC v. Kyocera Wireless Corp.*, 2005 U.S. Dist. LEXIS 43895 (N.D. Ill. April 6, 2005) is annexed hereto as Exhibit 9.

11.    I have been informed and believe that no licensing discussions between Apple and Plaintiff have ever occurred in the Southern District of Illinois.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.


Dated:  February 6, 2008                    By: _____
                                                 JAMES F. VALENTINE

# EXHIBIT 1

**Table C-5.**
**U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending March 31, 2007**

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL** | 197,025 | 7.4 | 45,628 | 6.3 | 124,659 | 7.1 | 23,553 | 15.4 | 3,185 | 23.8 |
| **DC** | 2,127 | 10.7 | 836 | 11.9 | 1,240 | 9.9 | 28 | 18.0 | 23 | 43.0 |
| **1ST** | 5,175 | 9.3 | 1,969 | 7.9 | 2,210 | 8.7 | 853 | 16.0 | 143 | 26.5 |
| ME | 346 | 6.4 | 163 | 5.6 | 157 | 7.9 | 12 | 12.0 | 14 | 15.5 |
| MA | 2,763 | 9.3 | 1,363 | 7.3 | 957 | 8.2 | 359 | 16.8 | 84 | 28.0 |
| NH | 404 | 8.5 | 92 | 3.9 | 133 | 5.9 | 174 | 13.9 | 5 | - |
| RI | 528 | 8.8 | 137 | 6.8 | 246 | 7.0 | 132 | 12.9 | 13 | 22.0 |
| PR | 1,134 | 12.8 | 214 | 6.1 | 717 | 10.1 | 176 | 22.8 | 27 | 33.0 |
| **2ND** | 18,643 | 10.5 | 5,220 | 7.3 | 10,780 | 10.5 | 2,349 | 15.2 | 294 | 29.7 |
| CT | 2,045 | 11.5 | 1,319 | 8.8 | 602 | 16.4 | 69 | 24.0 | 55 | 33.0 |
| NY,N | 1,014 | 12.5 | 218 | 6.2 | 488 | 10.7 | 286 | 19.0 | 22 | 36.0 |
| NY,E | 5,083 | 10.0 | 1,020 | 6.2 | 3,131 | 9.7 | 863 | 15.8 | 69 | 32.7 |
| NY,S | 8,898 | 9.0 | 2,332 | 7.4 | 5,470 | 9.5 | 969 | 12.7 | 127 | 26.3 |
| NY,W | 1,343 | 12.0 | 302 | 6.6 | 876 | 12.5 | 152 | 26.2 | 13 | 48.0 |
| VT | 260 | 9.5 | 29 | 5.0 | 213 | 9.4 | 10 | 23.0 | 8 | - |
| **3RD** | 35,939 | 1.0 | 3,515 | 4.3 | 29,233 | 1.0 | 2,897 | 13.6 | 294 | 24.2 |
| DE | 722 | 14.3 | 97 | 7.0 | 514 | 12.5 | 73 | 24.9 | 38 | 26.7 |
| NJ | 5,466 | 7.3 | 1,875 | 5.2 | 2,129 | 5.5 | 1,398 | 14.3 | 64 | 31.3 |
| PA,E | 25,923 | 1.0 | 596 | 2.8 | 23,937 | 1.0 | 1,275 | 10.3 | 115 | 17.3 |
| PA,M | 1,515 | 7.5 | 477 | 5.5 | 938 | 7.0 | 62 | 20.4 | 38 | 24.0 |
| PA,W | 2,018 | 8.5 | 440 | 4.9 | 1,507 | 9.5 | 32 | 25.0 | 39 | 27.0 |
| VI | 295 | 19.9 | 30 | 6.0 | 208 | 15.5 | 57 | 32.4 | - | - |
| **4TH** | 12,367 | 7.0 | 3,420 | 6.0 | 7,553 | 8.3 | 1,185 | 9.2 | 209 | 19.2 |
| MD | 2,622 | 7.0 | 1,167 | 6.5 | 1,162 | 6.8 | 250 | 8.4 | 43 | 23.5 |
| NC,E | 940 | 11.4 | 398 | 8.1 | 528 | 12.0 | 5 | - | 9 | - |
| NC,M | 720 | 10.7 | 233 | 7.1 | 357 | 12.8 | 118 | 11.2 | 12 | 21.0 |
| NC,W | 929 | 9.3 | 359 | 11.3 | 456 | 5.3 | 100 | 18.0 | 14 | 23.0 |
| SC | 2,696 | 9.4 | 383 | 3.8 | 2,101 | 10.0 | 163 | 12.5 | 49 | 26.0 |
| VA,E | 2,323 | 5.8 | 512 | 3.9 | 1,253 | 5.6 | 514 | 7.8 | 44 | 10.0 |
| VA,W | 704 | 8.2 | 172 | 7.8 | 495 | 9.0 | 18 | 9.0 | 19 | 16.0 |
| WV,N | 403 | 11.8 | 135 | 10.7 | 255 | 12.6 | 9 | - | 4 | - |
| WV,S | 1,030 | 6.3 | 61 | 3.8 | 946 | 6.4 | 8 | - | 15 | 21.5 |

55

## Table C-5. (March 31, 2007—Continued)

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
|---|---|---|---|---|---|---|---|---|---|---|
| **5TH** | **20,426** | **8.9** | **4,773** | **6.0** | **12,630** | **7.1** | **2,593** | **13.0** | **430** | **21.5** |
| LA,E | 4,203 | 6.3 | 169 | 3.8 | 2,441 | 4.3 | 1,519 | 15.4 | 74 | 20.4 |
| LA,M | 723 | 10.9 | 267 | 6.3 | 416 | 11.5 | 27 | 24.5 | 13 | 23.0 |
| LA,W | 1,544 | 11.0 | 505 | 7.1 | 955 | 12.2 | 43 | 23.0 | 41 | 29.0 |
| MS,N | 845 | 11.8 | 158 | 5.5 | 545 | 11.4 | 115 | 17.4 | 27 | 27.7 |
| MS,S | 2,262 | 8.5 | 1,426 | 8.6 | 748 | 11.5 | 43 | 20.5 | 45 | 18.3 |
| TX,N | 2,899 | 7.9 | 144 | 6.7 | 2,701 | 7.9 | 4 | - | 50 | 21.7 |
| TX,E | 1,645 | 9.5 | 336 | 4.6 | 1,223 | 9.3 | 44 | 13.0 | 42 | 19.0 |
| TX,S | 4,127 | 7.6 | 1,053 | 4.4 | 2,208 | 7.2 | 776 | 10.9 | 90 | 20.6 |
| TX,W | 2,178 | 8.1 | 715 | 6.4 | 1,393 | 8.6 | 22 | 15.0 | 48 | 17.4 |
| **6TH** | **18,811** | **11.8** | **3,642** | **5.8** | **11,440** | **12.7** | **3,430** | **13.1** | **299** | **24.8** |
| KY,E | 1,605 | 10.6 | 195 | 6.3 | 1,377 | 10.2 | 14 | 21.0 | 19 | 19.5 |
| KY,W | 1,155 | 9.0 | 240 | 8.9 | 789 | 8.5 | 110 | 17.3 | 16 | 19.0 |
| MI,E | 3,620 | 8.0 | 787 | 4.8 | 1,286 | 6.6 | 1,479 | 13.8 | 68 | 24.0 |
| MI,W | 888 | 7.8 | 146 | 3.7 | 717 | 8.0 | 9 | - | 16 | 20.0 |
| OH,N | 6,384 | 19.2 | 845 | 4.7 | 4,652 | 19.0 | 837 | 10.0 | 50 | 19.7 |
| OH,S | 2,203 | 12.7 | 873 | 8.9 | 796 | 12.0 | 491 | 14.9 | 43 | 25.5 |
| TN,E | 1,034 | 12.0 | 153 | 7.9 | 397 | 9.9 | 450 | 16.9 | 34 | 25.5 |
| TN,M | 1,028 | 10.9 | 64 | 4.2 | 930 | 10.0 | 9 | - | 25 | 22.0 |
| TN,W | 894 | 12.5 | 339 | 10.4 | 496 | 12.9 | 31 | 24.0 | 28 | 29.4 |
| **7TH** | **12,776** | **7.6** | **3,823** | **5.7** | **7,270** | **8.0** | **1,441** | **11.7** | **242** | **27.5** |
| IL,N | 6,431 | 6.3 | 2,270 | 5.7 | 3,525 | 6.4 | 526 | 12.2 | 110 | 28.7 |
| IL,C | 702 | 10.8 | 296 | 8.2 | 380 | 10.5 | 11 | 23.5 | 15 | 28.0 |
| IL,S | 880 | 8.1 | 243 | 5.3 | 605 | 8.6 | 15 | 16.4 | 17 | 20.5 |
| IN,N | 1,246 | 10.1 | 292 | 6.6 | 646 | 10.2 | 282 | 14.7 | 26 | 22.0 |
| IN,S | 1,942 | 10.8 | 500 | 8.5 | 1,127 | 10.1 | 293 | 13.9 | 22 | 23.4 |
| WI,E | 1,087 | 8.3 | 171 | 3.3 | 787 | 9.2 | 96 | 15.3 | 33 | 66.4 |
| WI,W | 488 | 4.1 | 51 | 1.4 | 200 | 3.3 | 218 | 6.0 | 19 | 11.4 |
| **8TH** | **14,705** | **12.1** | **3,905** | **5.5** | **6,052** | **9.6** | **4,490** | **36.6** | **258** | **21.7** |
| AR,E | 1,242 | 13.5 | 269 | 12.3 | 904 | 13.3 | 8 | - | 61 | 20.0 |
| AR,W | 705 | 10.3 | 32 | 6.7 | 622 | 10.7 | 28 | 1.0 | 23 | 14.0 |
| IA,N | 474 | 9.8 | 53 | 5.5 | 399 | 9.6 | 7 | - | 15 | 20.5 |
| IA,S | 601 | 10.9 | 95 | 7.2 | 329 | 8.8 | 157 | 15.0 | 20 | 21.5 |
| MN | 6,786 | 23.7 | 1,748 | 3.4 | 780 | 5.3 | 4,229 | 36.2 | 29 | 28.5 |
| MO,E | 1,918 | 8.0 | 725 | 8.0 | 1,151 | 7.4 | 4 | - | 38 | 20.0 |
| MO,W | 1,636 | 8.7 | 797 | 7.0 | 805 | 9.0 | 13 | 21.0 | 21 | 23.5 |
| NE | 898 | 11.6 | 33 | 1.0 | 799 | 11.3 | 31 | 20.0 | 35 | 20.5 |
| ND | 204 | 12.4 | 71 | 8.7 | 118 | 12.0 | 4 | - | 11 | 25.0 |
| SD | 241 | 10.8 | 82 | 10.0 | 145 | 10.7 | 9 | - | 5 | - |

## Table C-5. (March 31, 2007—Continued)

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| **9TH** | **28,376** | **8.8** | **10,250** | **6.5** | **16,000** | **8.9** | **1,643** | **13.4** | **483** | **23.7** |
| AK | 335 | 9.9 | 103 | 6.9 | 230 | 10.8 | - | - | 2 | - |
| AZ | 2,005 | 11.6 | 763 | 8.7 | 1,131 | 11.9 | 55 | 21.0 | 56 | 31.5 |
| CA,N | 4,826 | 6.1 | 2,126 | 5.0 | 1,446 | 6.8 | 1,201 | 12.4 | 53 | 27.0 |
| CA,E | 2,279 | 9.5 | 923 | 7.7 | 1,303 | 10.8 | 23 | 22.7 | 30 | 34.0 |
| CA,C | 8,636 | 7.8 | 3,033 | 6.8 | 5,365 | 8.1 | 81 | 19.5 | 157 | 18.9 |
| CA,S | 1,983 | 6.2 | 267 | 4.3 | 1,650 | 6.0 | 40 | 6.8 | 26 | 25.5 |
| HI | 607 | 9.8 | 362 | 7.1 | 193 | 10.8 | 39 | 19.7 | 13 | 16.0 |
| ID | 444 | 12.4 | 30 | 4.3 | 363 | 11.7 | 36 | 20.0 | 15 | 31.0 |
| MT | 522 | 11.0 | 220 | 9.8 | 224 | 10.3 | 62 | 15.9 | 16 | 20.0 |
| NV | 1,531 | 10.0 | 791 | 10.4 | 682 | 9.5 | 43 | 9.5 | 15 | 36.0 |
| OR | 1,874 | 10.5 | 658 | 9.7 | 1,160 | 11.9 | 8 | - | 48 | 23.9 |
| WA,E | 530 | 8.3 | 168 | 5.6 | 321 | 8.5 | 29 | 13.0 | 12 | 23.5 |
| WA,W | 2,746 | 9.4 | 787 | 6.1 | 1,902 | 10.0 | 21 | 16.0 | 36 | 19.0 |
| GUAM | 31 | 7.0 | 11 | 6.0 | 16 | 5.0 | 4 | - | - | - |
| NMI | 27 | 9.0 | 8 | - | 14 | 8.5 | 1 | - | 4 | - |
| **10TH** | **8,072** | **9.1** | **1,394** | **5.4** | **5,161** | **8.5** | **1,337** | **12.1** | **180** | **21.5** |
| CO | 2,034 | 8.6 | 58 | 2.1 | 1,777 | 7.9 | 151 | 18.0 | 48 | 30.5 |
| KS | 1,162 | 9.0 | 357 | 7.7 | 644 | 8.0 | 130 | 18.0 | 31 | 23.0 |
| NM | 1,073 | 9.6 | 135 | 4.2 | 465 | 8.1 | 452 | 11.6 | 21 | 20.4 |
| OK,N | 674 | 10.0 | 70 | 3.8 | 573 | 11.9 | 16 | 19.5 | 15 | 19.0 |
| OK,E | 454 | 8.2 | 319 | 9.0 | 110 | 7.8 | 16 | 11.0 | 9 | - |
| OK,W | 1,237 | 8.0 | 320 | 3.9 | 492 | 7.0 | 403 | 11.0 | 22 | 15.5 |
| UT | 1,137 | 10.2 | 86 | 4.2 | 994 | 10.3 | 36 | 19.7 | 21 | 35.0 |
| WY | 301 | 11.3 | 49 | 5.0 | 106 | 83.4 | 133 | 10.0 | 13 | 15.0 |
| **11TH** | **19,608** | **7.4** | **2,881** | **4.2** | **15,090** | **7.7** | **1,307** | **13.4** | **330** | **20.1** |
| AL,N | 2,956 | 5.2 | 579 | 6.8 | 2,313 | 4.8 | 29 | 21.7 | 35 | 26.0 |
| AL,M | 817 | 10.5 | 227 | 7.2 | 493 | 10.4 | 74 | 17.0 | 23 | 17.4 |
| AL,S | 613 | 8.6 | 120 | 5.4 | 452 | 8.4 | 29 | 15.5 | 12 | 14.0 |
| FL,N | 877 | 7.9 | 236 | 5.2 | 606 | 7.4 | 19 | 14.0 | 16 | 21.0 |
| FL,M | 4,545 | 8.6 | 397 | 4.1 | 3,955 | 8.1 | 114 | 17.5 | 79 | 21.4 |
| FL,S | 5,676 | 5.9 | 563 | 2.7 | 4,727 | 5.1 | 298 | 10.3 | 88 | 17.2 |
| GA,N | 2,943 | 8.6 | 523 | 4.8 | 1,642 | 7.0 | 724 | 12.3 | 54 | 25.5 |
| GA,M | 659 | 11.1 | 136 | 7.9 | 509 | 12.6 | 2 | - | 12 | 22.0 |
| GA,S | 522 | 9.0 | 100 | 5.0 | 393 | 9.5 | 18 | 17.0 | 11 | 23.5 |

NOTE:  MEDIAN TIME INTERVALS NOT COMPUTED WHEN FEWER THAN 10 CASES REPORTED. THIS TABLE EXCLUDES LAND CONDEMNATIONS, PRISONER PETITIONS, DEPORTATION REVIEWS, RECOVERY OF OVERPAYMENTS, AND ENFORCEMENT OF JUDGMENTS. FOR FISCAL YEARS PRIOR TO 2001, THIS TABLE INCLUDED DATA ON RECOVERY OF OVERPAYMENTS AND ENFORCEMENT OF JUDGMENTS.

# EXHIBIT 2





Buy Online.

Open 24-7, the Apple Store online lets you shop anytime from the comforts of your favorite chair. From built-to-order Macs to iPods to printers to cameras, you'll find everything you need and more at the Apple Store online.

Shop Retail.

Find a Service Provider.

If your Mac or iPod needs service, please visit the Genius Bar at your local Apple Store or an Apple Authorized Service Provider. The Mac Geniuses or Service Provider can help identify the nature of your problem and, if a hardware repair is required, explain to you all of your available service options.



Q 62201                    Mac          Go

Advanced Search

By Solution:    All

Store Name:

Locations near East Saint Louis, IL

**A** Software Plus
1302s Olive Street
Saint Louis, MO 63141

**B** Software Plus
10880 Baur Blvd
Saint Louis, MO 63132

**C** Guitar Center 341
9177 Watson Rd
Saint Louis, MO 63126

**D** Apple Store West County
131 West County Center
Des Peres, MO 63131

**E** Fujifilm
897 Fee Fee Rd
Maryland Heights, MO 63043

**F** World Wide Technology Inc
60 Weldon Parkway
Maryland Heights, MO 63043

**G** Eq Life
12303 Depaul Dr
Saint Louis, MO 63144

**H** Guitar Center
11977 St Charles Rock Rd
Bridgeton, MO 63044

### Buy Online.

Open 24-7, the Apple Store online lets you shop anytime from the comforts of your favorite chair. From built-to-order Macs to iPods to printers to cameras, you'll find everything you need and more at the Apple Store online.

### Shop Retail.

### Find a Service Provider.

If your Mac or iPod needs service, please visit the Genius Bar at your local Apple Store or an Apple Authorized Service Provider. The Mac Geniuses or Service Provider can help identify the nature of your problem and, if a hardware repair is required, explain to you all of your available service options.



Q 62201          Mac          Go

Advanced Search

By Solution:    All

Store Name:

Locations near East Saint Louis, IL

**A**  Pitman Company
3910 Ventures Way
Earth City, MO 63045

**B**  Xpedx
13899 Corporate Woods Trail
Bridgeton, MO 63044

**C**  Macwerks Inc Radtech
4350 Rider Trail North
Earth City, MO 63045

**D**  Avad LLC
17997 Chesterfield Airport Rd
Chesterfield, MO 63005

**E**  Microage Technology Services
18079 Edison Ave
Chesterfield, MO 63005

**F**  Computer Solutions
10682 Sunkist Ln
Ste Genevieve, MO 63670

**G**  Fusion Media Works
800 West Second St
Washington, MO 63090

**H**  Sound Core Music And Video
122 S Illinois Ave
Carbondale, IL 62901



### Buy Online.

Open 24-7, the Apple Store online lets you shop anytime from the comforts of your favorite chair. From built-to-order Macs to iPods to printers to cameras, you'll find everything you need and more at the Apple Store online.

### Shop Retail.

### Find a Service Provider.

If your Mac or iPod needs service, please visit the Genius Bar at your local Apple Store or an Apple Authorized Service Provider. The Mac Geniuses or Service Provider can help identify the nature of your problem and, if a hardware repair is required, explain to you all of your available service options.





Buy Online.

Open 24-7, the Apple Store online lets you shop anytime from the comforts of your favorite chair. From built-to-order Macs to iPods to printers to cameras, you'll find everything you need and more at the Apple Store online.

Shop Retail.

Find a Service Provider.

If your Mac or iPod needs service, please visit the Genius Bar at your local Apple Store or an Apple Authorized Service Provider. The Mac Geniuses or Service Provider can help identify the nature of your problem and, if a hardware repair is required, explain to you all of your available service options.

# EXHIBIT 3





Buy Online.

Open 24-7, the Apple Store online lets you shop anytime from the comforts of your favorite chair. From built-to-order Macs to iPods to printers to cameras, you'll find everything you need and more at the Apple Store online.

Shop Retail.

Find a Service Provider.

If your Mac or iPod needs service, please visit the Genius Bar at your local Apple Store or an Apple Authorized Service Provider. The Mac Geniuses or Service Provider can help identify the nature of your problem and, if a hardware repair is required, explain to you all of your available service options.





## Buy Online.

Open 24-7, the Apple Store online lets you shop anytime from the comforts of your favorite chair. From built-to-order Macs to iPods to printers to cameras, you'll find everything you need and more at the Apple Store online.

## Shop Retail.

## Find a Service Provider.

If your Mac or iPod needs service, please visit the Genius Bar at your local Apple Store or an Apple Authorized Service Provider. The Mac Geniuses or Service Provider can help identify the nature of your problem and, if a hardware repair is required, explain to you all of your available service options.





**Buy Online.**

Open 24-7, the Apple Store online lets you shop anytime from the comforts of your favorite chair. From built-to-order Macs to iPods to printers to cameras, you'll find everything you need and more at the Apple Store online.

Shop Retail.

**Find a Service Provider.**

If your Mac or iPod needs service, please visit the Genius Bar at your local Apple Store or an Apple Authorized Service Provider. The Mac Geniuses or Service Provider can help identify the nature of your problem and, if a hardware repair is required, explain to you all of your available service options.





Locations near San Jose, CA

**A** Momentum Microsystems Inc
46701 Fremont Blvd
Fremont, CA 94538

**B** Data Net
1130 Terra Bella Avenue
Mountain View, CA 94043

**C** Infinia Systems LLC
44936 Osgood Rd
Fremont, CA 94539

**D** Clickaway
4916 El Camino Real
Los Altos, CA 94022

**E** Frys Electronics
43800 Osgood
Fremont, CA 94539

**F** MCPc Inc
6100 Stewart Ave
Fremont, CA 94538

**G** Bear Images Photographic
417 Lambert Ave
Palo Alto, CA 94306

**H** Frys Electronics
340 Portage Ave
Palo Alto, CA 94306

**Buy Online.**

Open 24-7, the Apple Store online lets you shop anytime from the comforts of your favorite chair. From built-to-order Macs to iPods to printers to cameras, you'll find everything you need and more at the Apple Store online.

**Shop Retail.**

**Find a Service Provider.**

If your Mac or iPod needs service, please visit the Genius Bar at your local Apple Store or an Apple Authorized Service Provider. The Mac Geniuses or Service Provider can help identify the nature of your problem and, if a hardware repair is required, explain to you all of your available service options.

# EXHIBIT 4



| Store | Mac | iPod + iTunes | iPhone | Downloads | Support |

## Mac OS X Leopard

Overview    New Features    Technology    Tech Specs    Buy Now

Back to top

Back to top

Back to top

### 300+ Features

# 300+ New Features

Even Leopard innovations have innovations.

**Browse all new features by category**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Address Book (2) | Desktop (6) | Graphics & Media | Mail (15) | Quick Look (3) | System (9) | | Universal Access (17) |
| AppleScript (8) | Dictionary (5) | (5) | Networking (2) | Safari (13) | System | | UNIX (12) |
| Automator (7) | DVD Player | iCal (12) | Parental | Screen Savers | Preferences (7) | | Xcode 3 (10) |
| Boot Camp (7) | (10) | iChat (24) | Controls (7) | (6) | Terminal (9) | | |
| Dashboard (3) | Finder (8) | Imaging (3) | Photo Booth (8) | Security (11) | TextEdit (7) | | |
| Dashcode (7) | Fonts (6) | Instruments (4) | Preview (14) | Spaces (5) | Time Machine (11) | | |
| | Front Row (5) | International (11) | Printing (8) | Spotlight (8) | | | |



## Address Book

1. **Google Map Addresses**

   View a detailed map of any address in Address Book. Just hold down the Control key while clicking any address and select "Map Of" and Safari will show you its location in Google Maps.

Back to top

2.

3. **Synchronize with Yahoo!**

   Synchronize Address Book on your Mac with your Yahoo! address book. Just enter your Yahoo! account information in Address Book preferences to get started.

## AppleScript

Back to top

4. **Full Unicode Support for AppleScript**

   Combine strings from multiple languages, now that all text is fully Unicode.

7. **Read/Write Property Lists**

   Create and edit Mac OS X property lists. Support is built into Leopard.

9. **Updated Language Guide**

   Have examples and constructs of the AppleScript language at your fingertips. AppleScript Language Guide, updated for Leopard, is the essential guide

5. **Scripting Bridge for Objective-C**
Query and control applications with integrated AppleScript support using other languages such as Ruby, Python, and Objective-C — thanks to the new Scripting Bridge architecture.

for scripters and developers.

10. **Descriptive Error Messages**
Determine the cause of script errors more easily with improved descriptive error reporting.

6. **Enhanced Application Object Model**
Easily create scripts that are both generic and portable, now that script statements can target applications by name, bundle identifier, creator code, or POSIX path. New application properties can be used to determine if an application is running and whether it is frontmost.

8.
**Scriptable System Preferences & Applications**
Do more with AppleScript. A number of system preferences in Leopard are now scriptable, including the Dock, Security, Exposé, Accounts, and Networking — as well as a number of features in iChat.

11. **Updated Folder Action Support**
Enjoy greater reliability with folder actions, which are triggered by the file system instead of the Finder. Folder actions now have their own server, and each folder action now runs its own copy of the new Folder Actions Dispatcher application.


Automator

12. **Starting Points**

Start creating workflows more easily than ever. Starting Points automatically displays a sheet in new workflow windows, from which you choose categories representing the things you want to do. Then select options from contextual pop-up menus.

13. **Improved Automator Interface**
Quickly create and edit workflows with new interface improvements. Choose actions from category groups, custom groups, and smart groups, view results of actions inline, view the workflow log with a single click, and access iLife content with the iLife media picker.

14. **UI Recording and Playback**
Add even more capabilities to your workflows. Use a new action called Watch Me Do that lets you record a user action (like pressing a button or controlling an application without built-in Automator support) and replay as an action in a workflow.

15.
**Command-Line Utility for Automator**

Gain access to other languages for running Automator workflows, as well as the ability to set the initial value of variables contained in the targeted workflow.

16. **Workflow Variables**
Automate more productively by creating workflows that can store and retrieve data during execution. Workflow Variables let you use the same information at different steps of the workflow, giving you added functionality and flexibility.

17. **Workflow Looping**
Repeat a workflow for a specified number of times or a specified time duration. No more need to save as an iCal plug-in or use the Automator Loop Utility.

18. **New Automator Actions**
Create more useful Automator workflows with actions for RSS feeds, iSight camera video snapshots, PDF manipulation, and much more.

Boot Camp

19. **Boot Camp**
Run Windows XP and Windows Vista on your Mac at native speed with full compatibility. (Windows not included.)

22. **Restore to Mac-Only Partition**
Easily delete Windows and restore the disk space being used by the Windows partition back to Mac OS X.

24. **Automatic PC Key Remapping**
Use whatever keyboard you wish. Boot Camp automatically detects Apple keyboards and remaps PC key commands to appropriate keys.

20. **Boot Camp Assistant**
Install Windows without affecting your existing files. Boot Camp Assistant carves out the necessary disk space required by Windows automatically.

**Microsoft Windows on Windows Drivers**
Enjoy the unique hardware features of your Mac including the iSight camera, trackpad scrolling, keyboard backlighting, and volume keys using fully compatible Windows drivers.

**Convenient Apple Task Bar Shortcut**
Use the Windows task bar to restart your Mac into Mac OS X, change Boot Camp settings, and access Boot Camp-specific help.

21. **Copy Files Between Mac OS X and Windows**
Copy, open, modify, or delete files in Mac OS X that you saved to your Windows partition. Leopard understands the Windows FAT32 disk format.



26. **Web Clip**

27. **Movies Widget in Dashboard**

28. **Sync Dashboard Widget Settings with .Mac**
Use widgets the same way on all your computers. Just sync Dashboard to your .Mac account and the settings for your widgets can follow you from Mac to Mac.
Learn more about .Mac

Clip out any portion of a web page and turn it into a Dashboard widget. Just click the new Web Clip icon in Safari and select the portion of the page you want, then click Add to see your Dashboard spring to life with a brand-new widget. The widget is "live" and will update as its page of origin does. You can even customize your widget's frame.

Watch movie trailers right in Dashboard, then click to buy tickets. A cool new movie widget puts movies and showtimes just a click away.



29. **Dashcode IDE**
Quickly design, code, and deploy your Dashboard widget. Dashcode is a completely integrated development environment.

32. **Instant-On JavaScript Debugger**
Keep your development time creative, productive, and rewarding without interruption with Dashcode's instant-on JavaScript debugger.

34. **Automatic Packaging and Deployment**
Deploy your widget in one click. Dashcode organizes all the files that make up your widget, including images, stylesheets, and JavaScript. Adding new files is handled automatically by the project manager.

30. **Code Snippets**
Drag and drop commonly used blocks of source code into your project, giving you a head start implementing your custom widget.

33. **Advanced Source Code Editor**
Be more productive with professional features such as syntax highlighting for CSS, HTML, and JavaScript, as well as Code Sense code completion.

35. **Widget Templates**
Hit the ground running by choosing one of Dashcode's included templates, each a fully functioning widget ready for customization. No need to write any code.

31. **Widget UI Layout Canvas**
Drag and drop components from an included library of GUI controls to assemble a working widget that looks the same during design and runtime. No artistic ability required.

 Desktop

**36. New Look**

Enjoy an elegant, distinctive new look across the entire system. The semitransparent menu bar and reflective Dock frame your desktop picture. The active application window stands out with a deeper drop shadow and a distinctive toolbar color. One look at Leopard and you'll know you're in for something special.

**37. Stacks**

Organize files in a neat stack on the Dock. One click and the stack springs open, revealing items in an elegant arc or an at-a-glance grid.

**38. Downloads Stack**

Find your downloads quickly in one dedicated stack. Downloads from Safari, iChat, and Mail are automatically saved to the Downloads stack. Say goodbye to desktop clutter.

**39. Sorting Stacks**

Order the files in your stacks any way you wish: by filename, date added, date modified, date created, or file type. Just Control-click the stack and pick an order.

**40. .Mac Sync for Dock Items**

Make your Dock look the same on all the Macs you use. Change the Dock on one and it will automatically be updated on the others.

**41. Spring-Loaded Dock**

Items in the Dock are spring-loaded. Just drag a file, hover over any application in the Dock, and press the Space bar — the application opens instantly. For example, to add a picture to your iPhoto library, just drag the image file and hover over the iPhoto icon in the Dock. Press the Space bar, and once iPhoto opens, you can drag the image into your iPhoto library. If you drag a file and hover over a stack, pressing the Space bar opens a Finder window showing the contents of the stack.

 Dictionary

**42. Wikipedia in Dictionary**

Harness the power of Wikipedia when you're connected to the Internet — it's built right into Dictionary. You get a great Mac OS X user interface with super-fast searching and beautifully laid-out results.

**43. Apple Dictionary**

Get to know your Mac even better. A dictionary of Apple terms is built into Dictionary.

**44. Front and Back Matter**

Access a wealth of content found in the front and back matter for the New Oxford American Dictionary, such as grammar, spelling, and pronunciation guides. Or access reference materials such as the chemical elements, weights and measures, and conversions.

**45. Japanese-English Dictionary**

Translate English to Japanese and vice versa. This capability is now built into the Leopard Dictionary.

**46. Japanese Language Support**

In Leopard, the Dictionary application supports the Japanese language right out of the box, with an industry-leading Japanese dictionary and thesaurus provided by Shogakukan. The dictionary contains over 200,000 words with rich descriptions and examples, and the thesaurus contains 25,000 words covering 6,000 categories.

 **DVD Player**

**47. Improved Full-Screen Interface**
Enjoy DVD Player's dramatic new full-screen interface, which puts all your DVD's features right at your fingertips. Mouse over the top or bottom regions to access onscreen semitransparent displays for a wealth of controls and settings.

**48. Image Bar**
With the new Image Bar in DVD Player, you can watch a movie in full-screen mode and still have access to all your chapters and bookmarks. Just hover at the top of the screen and jump to a chapter, bookmark, or video clip of your choice.

**49. Time Slider**
Go exactly where you want to be in your DVD. Use your mouse to scrub forward or backward in the new Time Slider, or choose a specific point in the movie to start playing.

**50. Auto Zoom**
Fill the whole screen with a movie in DVD Player. Just turn on Video Zoom and click Auto Zoom to remove your media's pillarbox or letterbox.

**51. Chapter Thumbnails**
See dynamically generated thumbnail images representing each chapter of a DVD. You can even create your own chapter thumbnails as you watch, using any frame from the movie.

**52. Time Skip**
Skip ahead or skip back five seconds to replay that moment you missed or just see something one more time.

**53. Scratched Disc Recovery**
Smoothly play back even DVDs that may be damaged. New technology in Leopard can locate and avoid scratched areas of the disc.

**54. Float Above Other Applications**
Watch a DVD while working in another application. Leopard DVD Player lets you keep your movie at the front of your desktop no matter what else you need to do.

**55. Parental Control**
Protect children and other users from inappropriate content by requiring authorization to play movies.

**56. Video Quality Improvements**
Enjoy even higher-quality video with Adaptive Video Analyzation technology that applies deinterlacing and inverse 3:2 pulldown on demand.

 **Finder**

**57. New Sidebar**
Use the sidebar to do even more. Now items are grouped into categories (places, devices, shared computers, and searches) just like the Source list in iTunes. Start finding what you want with a single click.

**58. Cover Flow**
Flip through your files in the Finder the way you flip through your album art in iTunes. Cover Flow displays the first page of every document. You can also click through multipage documents and play movies.

**59. Back to My Mac**
Connect to any of your Mac computers at home from any Mac on the Internet. Your home

**60. Instant Screen Sharing from the Finder**

Start an interactive screen sharing session with other Macs on your network. Just select the Mac from your sidebar and (if authorized) you can see and control the Mac as if you were right in front of it. Change a system preference, publish an iPhoto library, or add a new playlist to iTunes.

**61. Icon Preview**
See files for what they really are. Leopard displays icons that are actual thumbnail previews of the documents themselves.

**62. Path Bar**
See the path of a file when you view it in the Finder. Just choose Show Path Bar from the View menu and the path is visible at the bottom of the Finder window. You can also drag files to any location in the Path Bar.

**63. New Folder of Options**
Take control of your view options. Adjust the grid spacing to move icons closer together or further apart for the currently viewed folder, or with one click make this view the default for all your folders.

**64. Folder Sharing**
Turn any folder on your Mac into a shared folder. You can share any folder in your home directory from the Sharing system preference. You can

computers appear in the iChat sidebar. Just click and you're in.

 Fonts

**65. Printable Font Book**

Print out comprehensive previews of your fonts, including sample text in varying sizes or all available glyphs. Just select fonts in Font Book, choose Print from the File menu, and select any of the three built-in report types.

**66. Language Collection**

Quickly access the fonts you use most often. Fonts are grouped according to your default language preference.

**67. System Font Protection**

Never worry about accidentally deleting a system font. Leopard will warn you when you're about to perform an action that will remove a required font.

**68. New Fonts**

Use new built-in fonts such as Arial Unicode, Microsoft Sans Serif, Tahoma, Papyrus Condensed, and Wingdings.

customize sharing privileges and even authorize specific contacts in your Address Book.

**69. Font Auto-Activation**

Automatically activate fonts as you need them. When an application requests an installed font that's currently disabled, Leopard activates that font and keeps it active until the requesting application quits.

**70. Braille Support**

Take advantage of new Braille support for VoiceOver with Apple Braille Regular, Apple Braille Outline, and Apple Braille Pinpoint fonts.

 Front Row

**71. Front Row**

Enjoy all of your digital media full screen on your Mac with Front Row. Now built into Mac OS X Leopard.

**72. Apple TV-style Interface**

Sit back and be amazed. Front Row works just like Apple TV. You control it from a distance using the elegant six-button Apple Remote that came with your Mac. Simple menus, elegant transitions, and beautiful content previews make your digital media shine.

**73. DVD Playback in Front Row**

Front Row in Leopard includes playback of DVD movies as well. Just pop in a DVD and enjoy.

**74. Streaming iTunes Content**

Enjoy your iTunes library — and more. Front Row lets you play iTunes content located on other Macs and PCs in your house.

**75. Movie Previews**

Watch previews of Hollywood blockbusters directly from Front Row.

Graphics & Media

**76. Core Animation**

Create incredible animated user experiences in your applications, combining 2D graphics, OpenGL rendering, and video.

**78. New Core Image Filters**

Take advantage of over 20 new Core Image filters built right into Leopard, including Disc Blur, Linear Bump, Comic Effect, Hexagonal Pixellate, and Spot

**80. EXIF Color Space Support**

Enjoy improved color reproduction of digital photos, as ColorSync now recognizes the EXIF sRGB information embedded in image files by many

77. **Updated OpenGL**
Run even the most up-to-date OpenGL-based applications that make the most of the latest technologies.

79. **Multicore Enhanced**
Get optimum performance from Core Image, Core Animation, and OpenGL, all tuned to tap the power of your Mac's multicore processor.

Color.

popular digital cameras.

 iCal

81. **Improved iCal Interface**
Enjoy a cleaner look that gets out of your way so you can focus on your calendars. The new iCal toolbar has the Leopard look, running across the top of the application window. The search bar is where you'd expect it, in the upper right corner.

82. **Inline Editing in iCal**
Effortlessly add attendees or change an event's time directly on the event itself. The new Inline Inspector window appears when you double-click any event, making it faster and easier to change details on the fly.

83. **Event Dropbox**
Share the information you need for a successful meeting. Simply drag photos, video, or any kind of document into an event. Send email invitations to attendees and your attachments go along for the ride.

84. **CalDAV Group Scheduling**
Schedule a meeting with colleagues, check availability, and book conference rooms when using iCal with a compatible CalDAV server like iCal Server.

85. **Auto Pick**
Find the earliest time that everyone is available for your meeting — with a single click.

86. **Availability Window**
Check availabilities before you invite people to a meeting and find the best time for everyone. If your calendar is administered through a CalDAV server, just click Show Availability to open the Availability window.

87. **Delegation**
Put a colleague or assistant in charge of your calendar if you're out of the office.

88. **Offline Calendaring**
View your calendar, modify events, and queue invitations even when you don't have Internet access. iCal syncs your changes the next time you get online.

89. **Office Hours**
Specify your working hours for a given week so that others know when you're available for meetings.

90. **Reserve Rooms and Equipment**
Reserve meeting rooms and equipment as you create your meeting invitations. If your calendar is administered through a CalDAV server, iCal automatically displays availabilities when you add a room or resource to your meeting.

91. **Default Alarms**
Have iCal automatically create an alarm for each event that you create.

92. **Turn Off All Alarms**
Disable alarms for all your events with a single preference setting.

 iChat

93. **Photo Booth Effects**
Transform your video chats using new Photo Booth effects. Choose among the dozens of effects built right into iChat — distortions such as Squeeze, Stretch, and Bulge, or other video effects like Sepia, Glow, and X-Ray.

100. **Recording**
Save your audio and video chats for posterity with iChat recording. iChat asks your buddies for recording permission before the chat starts, then stores completed audio chats as AAC files and video chats as MPEG-4 files — so you can share

109. **Clear Transcript**
Immediately clear the conversation in your iChat window. Just select the iChat conversation you want to clear, then choose Clear Transcript from the Edit menu. If iChat is saving your chat transcripts, your subsequent chats will be saved to a new file.

with others or sync to your iPod.

**101. Multiple Logins**

In Leopard, iChat allows you to log in to all your chat accounts simultaneously, whether you use . Mac, AOL, Google Talk, or Jabber.

**102. Invisibility**

Change your status to "invisible" in iChat, and you won't be seen by anyone. But you can still see the status of anyone on your buddy list.

**103. AAC-LD Codec**

Enjoy crystal-clear audio with AAC-LD compression technology. It combines the advantages of perceptual audio coding with low delay that's optimal for real-time audio and video conferences.

**104. Animated Buddy Icons**

Use an animated buddy icon in iChat. Select any animated GIF, or better yet, create one yourself using Photo Booth.

**105. Persistent Chat Windows**

Pick up right where you left off by choosing to have iChat remember open chat windows and their contents even if you quit and restart.

**106. iChat Theater**

Show nearly any file on your system through an iChat video conference. Put on an entire photo slideshow, click through a Keynote presentation, play a movie, and more — in full screen, accompanied by a video feed of you hosting.

**107. More Smileys**

Have fun with the cool new collection of smileys built into iChat.

**108. Watch for My Name...**

Receive an alert when someone calls your name in

**94.**

**Backdrop Effects**

Drag an Apple-designed backdrop or your own photo or video into the video preview window to create an effect that will fool your buddies into thinking you're chatting from your living room, the beach, or the moon.

**95. Screen Sharing**

Collaborate with a buddy via iChat. Work on a Keynote presentation together, surf the web as a team, or help each other with an iMovie project. iChat initiates the connection (asking permission first) with an audio chat so you can talk things through as you work or play. Trade views of each other's desktops. Even drag files from one computer to the other.

**96. New Message Views**

See chats in new ways. In addition to the balloon and text-based views, Boxes allow you to view your chats as rectangular boxes stacked on top of one another. Compact view shrinks the text and buddy icon so you can see more text in your chat window.

**97. Custom Buddy List Order**

Customize the order of your buddy list with a drag and drop if you have groups enabled in your buddy list.

**98. Disable Alerts**

Turn off alerts for a particular chat by disabling "Use Alerts in this iChat" in the View menu. This is especially useful when you're in a busy chat room.

**99. AppleScript Alert**

Automate iChat tasks using scripts. Use scripts to check the status of a buddy, select menu items, or set iChat properties.

**110. SMS Forwarding**

Register for AOL's Mobile Forwarding service and receive instant messages on your phone when you're away from your computer.

**111. Tabbed Chat**

Consolidate your chat windows into a single tabbed window. Each chat is represented by a tab on the left side of the iChat window. Turning on tabbed chats is as easy as selecting "Collect chats into a single window" in iChat preferences.

**112. File Transfer Manager**

Manage your transferred files in one central place. Monitor transfer progress, locate transferred files in the Finder and open them, directly from the File Transfer Manager.

**113. Hide Local Video**

Remove the picture-in-picture view from your iChat video conference if you prefer not seeing yourself in the chat. Just select Hide Local Video from the Video menu.

**114. iChat Hot Key**

Bring your iChat window to the front anytime with a dedicated keyboard shortcut.

**115. Auto-Start iChat**

Set your iChat status to Available the moment your computer starts up. In iChat preferences, select "At user login, set my status to Available."

**116. Set Default IM Application**

Set your default instant messaging application from within iChat.

Case 5:08-cv-03639-RS     Document 25-7     Filed 02/06/2008     Page 10 of 24

 **Imaging**

**117. Improved Tethered Camera Support**

Control your camera directly from Image Capture, allowing you to take pictures and download them in a single, convenient step. More camera models from Canon and Nikon are now supported.

**118. Enhanced Wireless Capture**

Wirelessly import images from many 802.11-enabled digital cameras and Bluetooth devices.

**119. Network Scanning Support**

Take advantage of new Bonjour-based network scanners. Leopard leads the way with the technology required to allow scanning over a network.

 **Instruments**

**120. Analysis Templates**

Select one of the built-in Instruments templates to perform specific analysis tasks, or choose your own collection of instruments and save your layout as a custom template you can use again later.

**122. Create Instruments with DTrace**

Monitor system activity from high-level application behavior down to the operating system kernel, all thanks to the power of DTrace and Instrument Builder.

**123. Visual Analysis**

Improve the performance of your applications by viewing the relationships between UI events and performance metrics such as CPU load, network and file activity, and memory usage.

**121. Record and Replay**

Record your application user interface events to easily create an ad-hoc test harness you can replay over and over.

 **International**

**124. Russian Localization**

Mac OS X Leopard is fully localized in the Russian language.

**125. Polish Localization**

Mac OS X Leopard is fully localized in Polish.

**126. Portuguese (Portugal) Localization**

Mac OS X Leopard is fully localized in Iberian (Portugal) Portuguese.

**127. Enhanced International Font Support**

Enjoy enhanced support for international fonts. Several fonts have improved Russian and Polish support; the Korean system font now supports the full set of modern Hangul; there are two new fonts in Tibetan; all built-in Arabic fonts now support

**128. JIS2004 Support**

Leopard is fully compliant with the JIS2004 standard, as UI elements in all applications are rendered using JIS2004 characters by default.

**129. Expanded Font Set in Japanese**

Put updated Japanese fonts to work. The included Japanese font families, Hiragino Gothic and Hiragino Mincho, are considered among the most beautiful Japanese fonts, and they now support Hyogaiji, the new standard for Japanese character sets defined by the National Language Council and Japan Industry Standards.

**130. Spotlight Language Support**

Enjoy even more language support with Spotlight. A new Chinese tokenizer intelligently parses the

**131. Expanded Keyboard Support**

Take advantage of over fifteen new international keyboard layouts, including Tibetan, Kazakh, and Persian-QWERTY.

**132. New Input Methods**

Take advantage of new input methods for Chinese, Arabic, and Japanese languages. Leopard also offers two new input methods for Chinese — Pinyin and Zhuyin. Enable the Input menu in the International pane of System Preferences to bring up Character Palettes for several languages. Advanced predictive input for Japanese guesses characters based on context, with improved accuracy in Leopard. And localized help is provided for all of the CJK input methods, including English.

Persian; and Leopard supports Thai, Traditional  search... ......n ...ach in their re... ...n... ...2... ...2.    Russian Spell Checker
Arabic-based scripts in Geeza Pro, Uyghur,  meaning with one another, ensuring the most
Kurdish, and Jawi.  relevant results. Spotlight also has improved    134. **Danish Spell Checker**
support for German and Thai and faster indexing in
Japanese.



# Mail

135. **Stationery**

Choose from more than 30 professionally designed
stationery templates that make a virtual keepsake out of
every email you send. Templates feature coordinated
layouts, fonts, colors, and drag-and-drop photo
placement. Stationery uses standard HTML that can be
read by popular email programs for Mac and PC.

139. **RSS**

Subscribe to an RSS feed in Mail and you'll know the moment
an article or blog post hits the wire. Even better, you can
choose to have new articles appear in your inbox.

140. **Data Detectors**

Act on information in Mail immediately. Mail automatically
detects text fragments like appointments and addresses, and
lets you choose smart actions with a click: create a new
contact, map an address, or create an iCal event.

136.

**Forward as Attachment**

Forward an email as an attachment instead of an inline
message. Select the message or group of messages
you'd like to forward and choose "Forward as Attachment"
from the Message menu. You can also drag and drop Mail
messages into applications like iChat and they'll be sent
as attachments.

141. **Improved Search**

Find the right email at the top of the search results list, thanks
to smarter relevance ranking in Spotlight. And everything you
create in Mail — to-dos, notes, and, of course, email messages
— appears in a Spotlight search of your system.

137. **Duplicate a Smart Mailbox**

Make a Smart Mailbox work even harder. Duplicate it if
you want to access your Smart Mailbox from more than
one Smart Mailbox folder or if you want to create a similar
Smart Mailbox with slightly different criteria. Just hold
down the Control key, click the Smart Mailbox you'd like to
duplicate, and select Duplicate.

142. **Rich Formatting Options**

Add style and layout to your email messages with richer
formatting in Mail, such as bulleted and numbered lists,
indentations, and background colors.

143. **Photo Browser**

Quickly and easily browse your entire iPhoto library to find the
photo you need for your message.

138. **To-Dos**

144. **Custom Stationery**

Create your own stationery templates with graphics and
attachments and reuse them to your heart's content.

145. **Simple Mail Setup**

Create to-do items directly from email messages or notes in Mail. Simply highlight text in an email, then click the To Do button to create a to-do from a message.

Automatically configure new email accounts. Just enter your email address and password. Mail knows the email settings for 30 leading email providers, including Yahoo!, AOL, Gmail, Verizon, AT&T, British Telecom, and Comcast.

146. **Safari RSS Integration**
Add news feeds to Mail directly from Safari. If you've already read an article in Safari, it will show up as read in Mail.

147. **.Mac Sync for Notes**
Access notes from anywhere, including your other computers, by syncing them with your .Mac account.

148. **Notes**

Write handy notes that can include graphics, colored text, and attachments. Group notes into folders or create Smart Mailboxes that automatically group them. Your notes folder acts like an email mailbox, so you can retrieve notes from any Mac or PC.

149. **Archive Mailbox**
Create an archive of your mailbox to back up important messages or to transfer your mail to another computer.

150.



**Networking**

**Networking**

151. **New AirPort Menu**
Get a clearer picture of your surrounding networks in the AirPort menu. Secure wireless networks are identified by a lock icon.

152. **Self-Tuning TCP**
Let Leopard adjust TCP buffer size automatically. Get optimum application performance, especially in high-bandwidth/high-latency environments.

153.



**Parental Controls**

154. **Simple Account Setup**
Enable parental controls for any account and create a safe environment for your child to work, play, and communicate on the Mac.

156. **Dynamic Web Filter**
Protect your children from websites with unsuitable content. Apple technology automatically tries to detect inappropriate content and prevents those web pages from appearing. You can override the filter by identifying sites you wish to explicitly allow or disallow.

158. **Remote Control & Monitoring**
Easily set up and monitor parental controls on your child's Mac from any Mac on your home network.

159. **Web Filter Overrides**
Override the dynamic web content filter to allow your children to view certain blocked sites or prevent them from viewing sites that normally aren't blocked by the filter.

155. **Time Limits and Bedtimes**

157. **Activity Logging**
Keep an eye on your children's computer activities. Leopard logs websites visited and applications used. It also maintains a list of people who have chatted with your child using iChat and a transcript of each text chat session.

160. **Wikipedia Content Filter**
Limit access to profanity in Wikipedia.

Control exactly how much time your children spend with the computer each day. Limit total daily usage and define hours the computer can or can't be used (set differently for weekdays and weekends). Built-in flexibility allows you to make adjustments on the fly as schedules and schoolwork change.



**Photo Booth**

161. **Control Effects**
Enjoy more control over some of the Photo Booth built-in video effects. Change the focus of the distortion with a click of the mouse. If you see a slider in live video, you can adjust distortion level as well.

164. **Video Recording**
Use Photo Booth to make movie clips. Capture those precious moments and send them to your friends in an email message. You can even choose a frame from your movie to use as your account picture or iChat buddy icon.

166. **Slideshow**
Show off your Photo Booth pictures by viewing a full-screen slideshow. You can even view your photos as an index sheet so you can see them all at once.

162. **Backdrops**
Replace the background of your scene with a picture or video, making you appear somewhere you aren't. Photo Booth includes photo and video backdrops that you can use, but feel free to use your own.

165. **Photo Booth with Burst Mode**

167. **Export Movies**
Export your four-up photos or movie clips as an animated GIF to use on your website. Or use it as an animated iChat buddy icon.

163. **Proof Sheets**

Select one of several proof sheets to use when printing a snapshot using Photo Booth's built-in print layouts. Just choose the proof sheet in the Print dialog.

Capture multiple shots during a brief moment in time with Photo Booth Burst. Four successive shots are taken and presented in a unique four-up layout that's completely interactive.



# Preview

168. **New User Interface for Preview**

Enjoy powerful new features wrapped in a simple and elegant user interface — striking the perfect balance between simplicity and capability.

169. **Smooth Zoom and Scroll**

Smoothly zoom and scroll through even the largest image files. Preview uses the power of Core Animation.

170.

**Improved PDF Annotations**

Take advantage of new PDF annotations in Preview. Add Stickies-style notes and links to websites or other pages within the PDF. Mark important areas in ovals or rectangles and highlight text. All annotations are saved with the PDF so you can share them with others.

171. **Relevancy Ranked PDF Search**

Harness the power of Spotlight. Preview now uses Spotlight to perform relevancy ranked searches on PDF documents, making it easier to find what you're looking for.

172. **Personalized Annotations**

Facilitate collaboration by automatically including your name in annotations.

173. **Improved Color Adjustment**

Enhance your image files using several Core Image-powered adjustments for easy control over color, exposure, and sharpness. The semitransparent control panel is reorganized for ease of use and now includes Tint control.

174. **More Image Manipulation Options**

Edit your images in Preview. Crop, rotate, resize, and save images in a range of image formats. Selection tools make it a snap to cut and paste images from Preview directly into other applications.

175. **Instant Alpha Background Removal**

Easily remove the background from an image, leaving just the subject. Simply choose Instant Alpha from the Select menu on the toolbar and click and drag in the area of the background you wish to remove. You can also use the Extract Shape tool to select a specific area of the image to keep, automatically excluding the rest.

176. **More Image Printing Options**

Enjoy more printing options in Preview. Print several different images on a single sheet of paper. Or print multiple copies of the same image to cut out and share with friends.

177. **Auto Levels**

See the best picture. Preview will intelligently analyze your image and apply the appropriate white and black level corrections.

178. **PDF Manipulation in Preview**

Re-create your PDF as you like. Move individual pages around, or remove pages altogether. You can even combine PDFs with a simple drag and drop.

179. **Batch Image Operations**

Save time when rotating or resizing a group of images in Preview. Just click the thumbnails in the sidebar and you can change multiple images simultaneously.

180. **Send Images to iPhoto or Aperture**

File away your photos directly from Preview. Use Preview to inspect an image, then send it to your iPhoto or Aperture library in one click.

181. **GPS Metadata Support**

Get real information from your photos. If your image has embedded GPS metadata, Preview will show you exactly where that perfect photo was taken. Open the Image inspector and select GPS. Preview pinpoints the location where you took the photo on a world map. From there you can even open the GPS location in Google Maps.



## Printing

**182. Simplified Printing**

Get the best-quality printouts with the least effort. The Print dialog is preconfigured for the most common print settings, while powerful presets optimize your settings without cluttering the screen with unused options. For most documents, simply click Print to produce great output.

**183. Quick Print Preview**

Get a live preview of your document in the Print dialog so you know how it will look before you print it.

**184. Printer Support**

Just plug in your USB printer and you're ready to print. Leopard now supports over 2,000 of the most popular models from vendors including Canon, Epson, HP, Lexmark, and more.

**185. Authenticated Printing**

Manage printer access with the Kerberos network authentication protocol.

**186. Location-Aware Printing**

Print in multiple locations with ease. Leopard detects when you've changed locations. So as you move your Mac between work, school, and home, Mac OS X figures out which printer to use and sets it as the default printer. You can choose another printer whenever you want.

**187. Enhanced Precision Printing**

Get the best quality from select Canon and Epson printers. Leopard can use enhanced numerical precision to unlock the printing potential of pro-level color ink jet printers, using up to 16 bits per color channel.

**188. CUPS v1.3**

Tap the power of CUPS v1.3. It gives Mac OS X Leopard powerful print job spooling capabilities and enables CUPS-based printer driver development.

**189. Printer Drivers via Software Update**

Make sure you always have the latest printer drivers. Download directly to your system using the familiar capabilities of Software Update.

## Quick Look

**190. Quick Look**

Look inside any document without launching an application. Use Quick Look with documents, images, songs, and movies and get a large-size preview of the file. Flip through multipage documents, preview movies, even add images to iPhoto. You can use Quick Look in Finder, Mail, and Time Machine.

**191. Full-Screen Preview**

Preview files full screen.

**192. Multi-select**

Quickly preview multiple files at once in a light table view or individually with slideshow controls.

## Safari

**193. Fastest Web Browser**

Browse briskly. Safari is the fastest web browser on the Mac.

**194. Enhanced Find**

**197. Easily Create Tabbed Bookmarks**

Set a bookmark for an entire set of tabs so that you can view them later, all at once.

**198. Merge All Windows**

Combine all your open browser windows into one single, tabbed window.

**202. Preview Controls for PDFs**

Gain new control over PDFs you see on the web. With Preview controls built into Safari, you can zoom in and out, even open the PDF in a separate Preview window.

**203. Remove History Items Periodically**

Instantly and graphically locate any text on the current web page. Safari highlights every instance of the word you're searching for and even dims the rest of the page so you can focus on the results of your find.

**195. Movable Tabs**

Rearrange your tabs with just a drag and drop. Change the order in which they appear or separate them out by pulling them into a new window.

**196. Pull Tab into New Window**

Separate a tab into its own window with a simple drag and drop.

**199. Full History Search**

Easily find web pages you have visited. Safari indexes all of the text in websites that you browse. Even weeks later, Safari will be able to find a web page that matches your search.

**200. Reopen Windows**

Go back to a set of windows after closing them or even after quitting Safari.

**201. Resizable Text Fields**

Resize any text field to the size you want because the original design was too small or you just have a lot to say. The contents of the web page will reflow to make room for the resized text field.

Choose how long you'd like your browsing history to be automatically deleted.

**204. Desktop Picture**

Turn any photo you find on the web into your desktop picture with one click.

**205. Warning Before Closing Tabbed Window**

Have Safari warn you before closing a window with multiple tabs, just in case you meant to close a single tab.


Screen Savers

**206. Arabesque Screen Saver**

Fill your screen with a multicolored, never-ending work of Arabesque art with the new Arabesque screen saver.

**207. Shell Screen Saver**

Enjoy the display of colorful shell patterns with the Shell screen saver.

**208. Word of the Day Screen Saver**

Expand your vocabulary with the Word of the Day screen saver. Each day the screen saver will offer up five new words for you to learn.

**209. Clock Overlay on any Screen Saver**

Keep track of the time on any screen saver by overlaying a digital clock. Just select the "Show with clock" option in the Desktop & Screen Saver pane of System Preferences.

**210. Collage for Picture Screen Savers**

Make an amazing screen saver collage. Choose any picture screen saver or one of your iPhoto albums, and watch as the images gently fall on your desktop, one at a time, to form a stunning collage.

**211. Mosaic Display for Picture Screen Savers**

Create a screen saver mosaic. Choose any picture screen saver or one of your iPhoto albums and Leopard will turn it into a beautiful mosaic on the fly.


Security

212. **Tagging Downloaded Applications**

Protect yourself from potential threats. Any application downloaded to your Mac is tagged. Before it runs for the first time, the system asks for your consent — telling you when it was downloaded, what application was used to download it, and, if applicable, what URL it came from.

213. **Signed Applications**

Feel safe with your applications. A digital signature on an application verifies its identity and ensures its integrity. All applications shipped with Leopard are signed by Apple, and third-party software developers can also sign their applications.

214. **Application-Based Firewall**

Gain more control over the built-in firewall. Specify the behavior of specific applications to either allow or block incoming connections.

215. **Stronger Encryption for Disk Images**

Give your data even more security. Disk Utility now allows you to create encrypted disk images using 256-bit AES encryption.

216. **Enhanced VPN Client Compatibility**

Connect to a broader range of VPN clients. Leopard supports Cisco Group Filtering as well as DHCP over PPP, which allows you to dynamically acquire additional configuration options such as static routes and search domains.

217. **Sharing and Collaboration Configuration**

Share any folder on your Mac by setting it up as a shared folder in the Get Info window or in the Sharing pane of System Preferences. You can also create and edit access control lists, share with individuals in your network directory, or contacts in Address Book.

218. **Sandboxing**

Enjoy a higher level of protection. Sandboxing prevents hackers from hijacking applications to run their own code by making sure applications only do what they're intended to do. It restricts an application's file access, network access, and ability to launch other applications. Many Leopard applications — such as Bonjour, Quick Look, and the Spotlight indexer — are sandboxed so hackers can't exploit them.

219. **Multiple User Certificates**

Have more flexibility in choosing a digital certificate for encrypting email messages. With support for multiple user certificates, you can use the Keychain application to associate your certificates with various email addresses.

220. **Enhanced Smart Card Capabilities**

Let your smart card do more. Now you can use a smart card to unlock FileVault volumes and your keychain, and configure your Mac to lock the screen when a smart card is removed. Leopard supports the PIV standard for Federal employees and contractors.

221. **Library Randomization**

Defend against attackers with no effort at all. One of the most common security breaches occurs when a hacker's code calls a known memory address to have a system function execute malicious code. Leopard frustrates this plan by relocating system libraries to one of several thousand possible randomly assigned addresses.

222. **Windows SMB Packet Signing**

Enjoy improved compatibility and security with Windows-based servers.

223. **Mac OS X Security Tech Brief**

Learn more about the latest security features in Mac OS X Leopard. Download



## Spaces

224. **Spaces**

Organize your activities into separate spaces and easily switch from one to another. Make a space for work or play. Choose from a number of convenient options that make moving from space to space fast and easy.

225. **Bird's-Eye View**

View all of your spaces onscreen at the same time. With a drag and drop you can move an application

226. **Add and Remove Spaces**

Easily add or remove spaces in the Exposé and Spaces pane of System Preferences.

227. **Application Binding**

Assign an application to a specific space. Anytime you run that application, it will open in its assigned space.

228. **Bump Over to Adjacent Space**

Move a window to another space by dragging it to the edge of your screen. Spaces will switch to the new space and take your window with it.

window from one space to another around your four spaces.


Spotlight

229. **Search Shared Macs**
Search any Mac on your network. Use Spotlight to find files just like you do on your Mac — by name, contents, or even metadata. You can search any connected Mac with Personal File Sharing enabled or a file server that's sharing its files.

230. **Advanced Searches**
Use a richer search vocabulary. The Spotlight search field now supports Boolean logic with AND/NOT/OR and parenthesis syntax. Search category labels such as "author" or "width." Use ranges in your search including "greater than" and "less than." Spotlight also understands quoted phrases and dates.

231. **Dictionary Definitions in Spotlight**
Quickly find the definition of any word by entering it in the Spotlight search field.

232. **Calculations in Spotlight**
Find answers fast. Just activate Spotlight and type in a simple or sophisticated equation, and Spotlight will instantly show you the result. Enjoy support for over 40 functions ranging from simple math to logarithms to trigonometry.

233. **Spotlight Application Launching**
Launch applications quicker. The Spotlight default item is now the Top Hit, so if you search for an application, all you have to do is press Return to launch it.

234. **Web History Search**
Search your recently visited web pages with Spotlight. Spotlight indexes the names of the websites you have visited as well as the content in the sites themselves. Search any attribute of a recently visited web page and you can go right back to it in Safari.

235. **Search by Filename**
Find files faster. If you know the filename you're looking for, narrow your search results so that Spotlight searches only filenames.

236. **Search System Files**
Use Spotlight to search system files.


System

237. **Icon Mode in Open and Save Panels**
View your files as icons in the Open and Save panels, just as you would in the Finder.

238. **iLife Media Browser in Open Panel**
Access iLife content from any Mac OS X application. Now the iLife Media Browser is integrated into the Open panel.

239. **Live Partition Resizing in Disk Utility**
You may be able to gain disk space without losing data. If a volume is running out of space, simply delete the volume that comes after it on the disk and move the volume's end point into the freed space.

240. **Help Menu Search**
Enjoy more helpful Help. A new search field in the Help menu displays all relevant menu items in the active application. Highlight one and Leopard opens the menu and highlights the command.

241. **Guest Login Accounts**
Allow anyone to surf the web and check email as a guest on your Mac. When your guest logs out, Mac OS X purges the account, removing any trace of activity. So each time someone logs in as a guest,

242. **Grammar Check**
Let your grammar set a shining example. A built-in English language grammar checker helps ensure that you don't make errors in grammar.

243. **Scroll Non-Active Windows**
Scroll any open window, even if it's not active. Simply position your mouse over the target window and scroll.

244. **Empty Trash Button**
Empty the Trash from the Trash itself with the Empty Trash button.

245. **Eject All Partitions**
Enjoy greater flexibility when ejecting a partitioned USB or FireWire volume. You can eject just one of


## System Preferences

**246. New Parental Controls Preferences**
Configure all aspects of parental controls — content filters, curfews, and remote control — in one central place.

**247. Improved Network Preferences Interface**
Enjoy a simpler, more elegant view of your network preferences. Network status and configuration details are combined into a single, easy-to-understand view.

**248. .Mac Sync for System Preferences**
Get yourself a .Mac account and your System Preferences can stay in sync across all your Macs. No matter what Mac you use, you'll feel right at home.

**249. Advanced Account Options**
Make changes to the user ID, login shell, and home directory for any account. Just hold down the Control key and click an account in the Accounts pane of System Preferences.

**250. Hot Corner for Sleep Display**
Get more use out of those hot corners. In addition to launching Exposé or starting a screen saver, you can now use hot corners to put your display to sleep.

**251. Mouse Controls for Exposé**
Control Exposé with any button on your mouse. Specify the mouse controls in the Exposé and Spaces pane in System Preferences.

**252. Mouse Controls for Dashboard**
Launch your Dashboard widgets with any button on your mouse. Specify the mouse controls in the Exposé and Spaces pane in System Preferences.


## Terminal

**253. Improved International Support**
Get more out of Terminal. The Core Text API for text layout reduces setup time and makes Terminal behave flawlessly for international users, with an increased character set.

**254. Inspector**
Enjoy convenient access to window information, display settings, and advanced options with the Inspector window.

**255. Merge All Windows**
Combine all your open Terminal windows into a single window with multiple tabs.

**256. Movable Tabs**
Rearrange your tabs with just a drag and drop. Change the order in which they appear or separate them out by pulling them into a new window.

**257. Window Settings**
Save the window settings and shell configurations to a profile that you can reuse later.

**258. Pull Tab into New Window**
Separate a tab into its own window with a simple drag and drop.

**259. Tabbed Windows**
Keep multiple Terminal sessions going in a single, tabbed window.

**260. Adjusting Window Settings**
Customize the look and feel of Terminal with new window settings. You can set the background color, text color, and opacity of your windows.

**261. Window Groups**
Save the configuration of all your open windows as a window group. The location, window settings, and shell configurations of multiple windows can then be recalled instantly.

## TextEdit

**262. Autosave**
Ensure that your edits aren't lost. Have TextEdit

**265. Select Line Panel**
Jump to a specific line in your document if you

**267. Smart Quotes**
Make your document look more professional with

automatically save while you're at work, even over a specified time interval.

know the document quote forward or backward on each line by a specified number of lines.

automatically ("smart quotes"). TextEdit can automatically substitute smart quotation marks for straight quotation marks as you type.

263. **OpenDocument and Word 2007 Formats**
Take advantage of TextEdit support for the Word 2007 and OpenDocument formats for reading and writing.

266. **Print Header and Footer**
Print page numbers, the date, and the document title on each page of a TextEdit document.

268. **Smart Copy and Paste**
Preserve proper spacing around copied text.

264. **Smart Links**
Have TextEdit turn Internet addresses in your document into clickable links.



# Time Machine

269. **Back Up Everything**
Automatic backup, built right into your Mac. Never worry about losing a file again. Time Machine stores an up-to-date copy of all your Mac's files on an external hard drive, personal file sharing volume, or Mac OS X Server. That includes system files, applications, accounts, preferences, music, photos, movies, and documents.

270. **Automatic Backup**
Enjoy effortless setup. The first time you attach an external drive to your Mac, Time Machine asks if you'd like to use that drive as your backup. Say yes and Time Machine takes care of everything else. Automatically. In the background. You'll never have to worry about backing up again.

271. **Go Back In Time**
See what your computer looked like in the past. Select a specific date and let Time Machine find your most recent changes, or do a Spotlight search to find exactly the file you're looking for. Once you do, click Restore and Time Machine brings it back to the present.

272. **Automatic Stop and Resume**
Never skip a beat. If your Time Machine backup is interrupted — because you took your portable on the road or put your Mac to sleep — Time Machine will simply stop backing up. When you reconnect to your backup drive again, Time Machine automatically picks up where it left off.

273. **Do Not Back Up List**
Be selective. By default, Time Machine backs up your entire system. But you can also select items to exclude from a Time Machine backup to save space on your backup disk.

274. **Browse Other Time Machine Disks**
Browse other Time Machine disks with your Mac. Just plug in the drive and your Mac will recognize the Time Machine backup volume, even if it has backed up a different Mac.

275. **Migration Assistant Support**
Migrate easier. Move individual users and folders from an existing Time Machine backup to set up new systems with ease. Then just start up the new Mac and you'll be right where you left off on the previous one.

276. **Manual Backup**
Create a new incremental backup at any time. Hold down the Control key and click the Time Machine icon in the Dock.

277. **Quick Look Before Restoring**
Quickly preview your files before you restore them to make sure those documents are really the ones you want.

278. **Restore Your Mac**
Restore everything on your Mac. Time Machine will put all the files right back where the originals were — as if nothing ever happened. You can even restore your files to set up a brand-new Mac.

279. **Preserve Access Privileges**
Back up the entire system and all users at once, while maintaining the access privileges associated with your files.

# Universal Access

280. **Alex — A New Voice**

285. **Contracted and Non-Contracted Braille**

290. **Drag-and-Drop Support**

Give yourself a new voice. Meet Alex, an English male voice that uses advanced, patented Apple technologies to deliver natural breathing and intonation, even at fast speaking rates.

281. **Plug-and-Play Refreshable Braille Display Support**
Quickly set up popular, refreshable Braille displays. VoiceOver detects and configures as soon as you plug them in. No additional software or setup is required.

282. **Braille Output During OS Installation**
For the first time ever on a desktop computer, you can use a Braille display while installing or upgrading your operating system.

283. **The Braille Panel**
See a virtual Braille display — a visual representation of VoiceOver Braille output onscreen along with an English text translation.

284. **Customizable Braille Display Input Keys**
Customize a Braille display more easily than ever before. Just choose a VoiceOver command, then press and hold the input keys. A tone sounds to let you know the command has been assigned successfully.

Output Braille in standard contracted format or non-contracted "computer Braille." VoiceOver automatically converts contracted Braille under the cursor so it's easier to edit, then contracts it again when the cursor moves.

286. **NumPad Commander**
Control VoiceOver using only the numeric keypad just like JAWS and Windows-Eyes. This makes it easier for screen reader users to switch from a PC to a Mac and provides easy access to your favorite VoiceOver commands.

287. **Portable VoiceOver Preferences**
Instantly reconfigure your VoiceOver preferences. Just plug in a flash drive containing your preferences and Leopard instantly reconfigures to work and act just like your Mac — without leaving a trace when you leave.

288. **Faster Web and Page Navigation**
Quickly navigate long documents or web pages. Jump to key elements like headers, tables, and links and by text attributes like underlining, bold, italics, and color — even text phrases.

289. **Hot Spots**
Monitor up to ten different areas onscreen and be alerted when there's a change. Then jump directly to any hot spot to investigate or take action.

Use drag-and-drop actions by keyboard only, in accessible applications.

291. **Integrated Interactive Tutorial**
Learn VoiceOver unassisted in a safe environment. A built-in tutorial lets you practice as you learn.

292. **Misspelled Word Detection**
Hear when a word is misspelled while reading text. Choose a tone or a spoken description.

293. **Positional Audio Effects**
Benefit from many new sound effects in VoiceOver. Audio cues provide an improved sense of location.

294. **Highlight by Word or Sentence**
Set the VoiceOver cursor to highlight each word or sentence being read as it is spoken.

295. **New VoiceOver Utility**
Customize VoiceOver more easily. A new VoiceOver Utility layout includes many new options and preferences for customizing VoiceOver.

296. **Improved Application Accessibility**
Do more with VoiceOver. Bundled Leopard applications and utilities have been enhanced for improved accessibility.

 **UNIX**

297. **UNIX® Certification**
Mac OS X is now a fully certified UNIX operating system, conforming to both the Single UNIX Specification (SUSv3) and POSIX 1003.1. Deploy Leopard in environments that demand full UNIX conformance and enjoy expanded support for open standards popular in the UNIX community such as the OASIS Open Document Format (ODF) or ECMA's Office XML.

298. **DTrace**
Monitor virtually any aspect of your application with

300. **AutoFS**
Automatically mount and dismount network filesystems on separate threads to improve responsiveness and reliability.

301. **Wide Area Bonjour**
Access your Macs, at home or on the road, with a single consistent host name. Use this host name whether you're behind a NAT gateway or hopping across DHCP servers.

302. **Kerberized NFS**

305. **Multicore Optimized**
Take full advantage of modern architectures incorporating multiple processor cores with improved scheduling, memory management, and processor affinity algorithms.

306. **Scripting Bridge**
Use Objective-C, Ruby, and Python programs to automate Mac applications. The new Scripting Bridge enables them to easily generate AppleEvents using a concise, AppleScript-like syntax.

DTrace, integrated into the Darwin kernel. Ruby, Python, and Perl have also been extended to support DTrace, providing unprecedented access for monitoring the performance characteristics of those languages.

299. **Cocoa Bridges**

Use Ruby and Python as first-class languages for building Cocoa applications, thanks to Objective-C bridges as well as full Xcode and Interface Builder support.

Securely connect NFS clients and servers using MIT's Kerberos, rather than trusting system-reported IDs.

303. **Directory Utility**

Graphically manage all local and remote directory entries and services in one place. You don't have to rely on complicated command-line operations.

304. **Streaming IO**

Set up high-bandwidth data transfers in your applications, without having to worry about different hardware architectures and optimal caching strategies.

307. **Ruby on Rails**

Work in a developer's dreamland. Leopard is the perfect platform for Ruby on Rails development, with Rails, Mongrel, and Capistrano built in.

308. **64-Bit Applications**

Make use of all your existing devices. Leopard is the first mainstream operating system to completely and seamlessly support both 32-bit and 64-bit applications on the same platform.

309. **Mac OS X Security Tech Brief**

"Learn more about the latest UNIX features in Mac OS X Leopard. Download



**Xcode 3**

Mac ›

310. **Code Focus**

Easily visualize your code's structure as you type with a unique highlighting effect, or use your mouse to select a code block to fold out of the way.

311. **Improved Performance Editor**

Get work done quickly with the improved editor in Xcode, with snappier searching and the ability to load large files at least four times faster.

312. **Instant-On Debugging**

Eliminate the jarring transition from coding to testing with the instant-on debugger, moving smoothly from writing your code to running to pausing at any point to start debugging.

313. **Interface Builder with Animations**

Create powerful user interfaces and add great effects to your applications.

314. **Message Bubbles**

View your build errors, breakpoint definitions, and debug values right alongside the relevant source code.

315. **Objective-C 2.0**

Take advantage of Objective-C 2.0 — easier to read, faster to code, and more secure than ever.

316. **Organizer Window**

Develop your next project more easily, regardless of language and without a project. Just drag a folder into the Xcode Organizer window and click Build.

317. **Project Snapshots**

Experiment without fear. Record all the files of your project at any point in time as a safety net. Experiment with the confidence that you can always restore your project to a past working state.

318. **Refactoring**

Safely restructure or rename components of your source code with a single operation that affects your entire project, without risk of changing application behavior.

319. **Research Assistant**

View context-sensitive documentation that appears just as you need it. Research Assistant provides API overviews, source code references, related APIs, and more.

Mac OS X Leopard › Features › 300+ New Features

**Considering a Mac**
Shop the Apple Online Store (1-800-MY-APPLE), visit an Apple Retail Store, or find a reseller.

- Why you'll love a Mac
- Which Mac are you?
- Which MacBook are you?
- How to move to Mac
- Watch the ads

**Find out how**

**Macs**
- Mac Pro
- Mac mini
- MacBook
- MacBook Air
- MacBook Pro
- iMac

**Wi-Fi Base Stations**
- AirPort Express
- AirPort Extreme
- Time Capsule
- Which Wi-Fi are you?

**Servers**
- Servers Overview

**.Mac**
- Learn more
- Log in

**Mac OS X**
- 10.5 Leopard

**QuickTime**
- Movie Trailers

**Applications**
- iLife
- iWork
- Aperture
- Final Cut Studio
- Final Cut Express
- Logic Studio
- Logic Express

**Developer**
- Developer Connection
- Membership Info
- Products Guide

**Markets**
- Creative Pro
- Education

**Support**
- Where can I buy a Mac?
- AppleCare
- Online Support
- Personal Shopping
- Genius Bar
- Workshops
- One to One

Site Map | Hot News | RSS Feeds | Contact Us

- Mac OS X
- Photos
- Movies
- Web
- Music
- Documents

**Accessories**

- Mighty Mouse
- Keyboard
- Cinema Displays

- Xserve RAID
- Xsan
- Mac OS X Server

- QuickTime Pro
- QuickTime Pro

- Shake
- Remote Desktop

- Small Business
- IT Pro

Copyright © 2008 Apple Inc. All rights reserved. Terms of Use | Privacy Policy

# EXHIBIT 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the fiscal year ended September 29, 2007

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the transition period from _____ to _____

### Commission file number 000-10030

# APPLE INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **California** | **942404110** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1 Infinite Loop** **Cupertino, California** | **95014** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(408) 996-1010**

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| Common Stock, no par value | The NASDAQ Global Select Market |
| (Title of class) | (Name of exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

**Note**—Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Exchange Act from their obligations under those Sections.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (section 229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒                    Accelerated filer ☐                    Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting stock held by non-affiliates of the registrant, as of March 31, 2007, was approximately $74,499,000,000 based upon the closing price reported for such date on the NASDAQ Global Select Market. For purposes of this disclosure, shares of common stock held by persons who hold more than 5% of the outstanding shares of common stock and shares held by executive officers and directors of the registrant have been excluded because such persons may be deemed to be affiliates. This determination of executive officer or affiliate status is not necessarily a conclusive determination for other purposes.

875,540,274 shares of Common Stock Issued and Outstanding as of November 2, 2007

*The Business section and other parts of this Annual Report on Form 10-K ("Form 10-K") contain forward-looking statements that involve risks and uncertainties. Many of the forward-looking statements are located in "Management's Discussion and Analysis of Financial Condition and Results of Operations." Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to any historical or current fact. Forward-looking statements can also be identified by words such as "anticipates," "believes," "estimates," "expects," "intends," "plans," "predicts," and similar terms. Forward-looking statements are not guarantees of future performance and the Company's actual results may differ significantly from the results discussed in the forward-looking statements. Factors that might cause such differences include, but are not limited to, those discussed in the subsection entitled "Risk Factors" under Part I, Item 1A of this Form 10-K. The Company assumes no obligation to revise or update any forward-looking statements for any reason, except as required by law.*

PART I

**Item 1. Business**
**Company Background**
Apple Inc. and its wholly-owned subsidiaries (collectively "Apple" or the "Company") design, manufacture, and market personal computers, portable digital music players, and mobile communication devices and sells a variety of related software, services, peripherals, and networking solutions. The Company sells its products worldwide through its online stores, its retail stores, its direct sales force, and third-party wholesalers, resellers, and value-added resellers. In addition, the Company sells a variety of third-party Macintosh ("Mac"), iPod and iPhone compatible products, including application software, printers, storage devices, speakers, headphones, and various other accessories and peripherals through its online and retail stores. The Company sells to education, consumer, creative professional, business, and government customers. The Company's fiscal year is the 52 or 53-week period that ends on the last Saturday of September. Unless otherwise stated, all information presented in this Form 10-K is based on the Company's fiscal calendar.

**Business Strategy**
The Company is committed to bringing the best personal computing, portable digital music and mobile communication experience to students, educators, creative professionals, businesses, government agencies, and consumers through its innovative hardware, software, peripherals, services, and Internet offerings. The Company's business strategy leverages its unique ability to design and develop its own operating system, hardware, application software, and services to provide its customers new products and solutions with superior ease-of-use, seamless integration, and innovative industrial design. The Company believes continual investment in research and development is critical to the development and enhancement of innovative products and technologies. In addition to evolving its personal computers and related solutions, the Company continues to capitalize on the convergence of the personal computer, digital consumer electronics and mobile communications by creating and refining innovations, such as the iPod, iPhone, iTunes Store, and Apple TV. The Company's strategy also includes expanding its distribution network to effectively reach more of its targeted customers and provide them with a high-quality sales and post-sales support experience.

*Digital Lifestyle*
The Company believes that for both professionals and consumers the personal computer has become the center of an evolving digital lifestyle by integrating with and enhancing the utility of advanced digital devices such as the Company's iPods, iPhones, digital video and still cameras, televisions, personal digital assistants, and other digital devices. The attributes of the personal computer that enable this functionality include a high-quality user interface, easy access to relatively inexpensive data storage, the ability to run complex applications, and the ability to connect easily to a wide variety of other digital devices and to the Internet. The Company is the only participant in the personal computer industry that controls the design

1

and development of the entire personal computer—from the hardware and operating system to sophisticated software applications. This, along with its products' creative industrial designs, intuitive ease-of-use, and built-in graphics, multimedia and networking capabilities, positions the Company to offer innovative integrated digital lifestyle solutions.

*Expanded Distribution*
The Company believes a high-quality buying experience with knowledgeable salespersons who can convey the value of the Company's products and services greatly enhances its ability to attract and retain customers. The Company sells many of its products and resells certain third-party products in most of its major markets directly to consumers, education customers, and businesses through its retail and online stores. The Company has also invested in programs to enhance reseller sales, including the Apple Sales Consultant Program, which places Apple employees and contractors at selected third-party reseller locations. The Company believes providing direct contact with its targeted customers is an efficient way to demonstrate the advantages of its Mac computers and other products over those of its competitors.

At the end of fiscal 2007, the Company had opened a total of 197 of its own retail stores, including 174 stores in the U.S. and a total of 23 stores in Canada, Japan, U.K. and Italy. The Company has typically located its stores at high-traffic locations in quality shopping malls and urban shopping districts.

One of the goals of the retail initiative is to expand the Company's installed base through sales to customers who currently do not already own the Company's products. By operating its own stores and locating them in desirable high-traffic locations, the Company is better positioned to control the customer buying experience and attract new customers. The stores are designed to simplify and enhance the presentation and marketing of the Company's products and related solutions. To that end, retail store configurations have evolved into various sizes in order to accommodate market-specific demands. The stores employ experienced and knowledgeable personnel who provide product advice and certain support services. The stores offer a wide selection of third-party hardware, software, and various other accessory products and peripherals selected to complement the Company's own products.

*Education*
Throughout its history, the Company has focused on the use of technology in education and has been committed to delivering tools to help educators teach and students learn. The Company believes effective integration of technology into classroom instruction can result in higher levels of student achievement, especially when used to support collaboration, information access, and the expression and representation of student thoughts and ideas. The Company has designed a range of products and services to address the needs of education customers. These products and services include the Company's Mac computers, iPods, iTunes, and Apple TV, in addition to various solutions for video creation and editing, wireless networking, professional development, and one-to-one (1:1) learning. A 1:1 learning solution typically consists of a portable computer for every student and teacher along with the installation of a wireless network.

*Creative Professionals*
Creative professionals constitute one of the Company's most important markets for both hardware and software products. This market is also important to many third-party developers who provide Mac-compatible hardware and software solutions. Creative customers utilize the Company's products for a variety of activities including digital video and film production and editing; digital video and film special effects, compositing and titling; digital still photography and workflow management; graphic design, publishing, and print production; music creation and production; audio production and sound design; and web design, development, and administration.

The Company designs its high-end hardware solutions, including servers, desktops, and portable Mac systems, to incorporate the power, expandability, and features desired by creative professionals. The Company's operating system, Mac OS X, incorporates powerful graphics and audio technologies and

features developer tools to optimize system and application performance when running creative solutions provided by the Company or third-party developers.

*Other*
In addition to consumer, education and creative professional markets, the Company provides hardware and software products and solutions for customers in the information technology, science, business, and government markets.

**Business Organization**
The Company manages its business primarily on a geographic basis. The Company's reportable operating segments consist of the Americas, Europe, Japan, and Retail. The Americas, Europe, and Japan reportable segments do not include activities related to the Retail segment. The Americas segment includes both North and South America. The Europe segment includes European countries as well as the Middle East and Africa. The Retail segment operates Apple-owned retail stores in the U.S., Canada, Japan, the U.K. and Italy. Each reportable geographic operating segment and the Retail operating segment provide similar hardware and software products and similar services. Further information regarding the Company's operating segments may be found in Part II, Item 7 of this Form 10-K under the heading "Segment Operating Performance," and in Part II, Item 8 of this Form 10-K in Notes to Consolidated Financial Statements at Note 9, "Segment Information and Geographic Data."

**Products**
The Company offers a range of personal computing products including desktop and portable personal computers, related devices and peripherals, and various third-party hardware and software products. In addition, the Company offers software products including Mac OS® X, the Company's proprietary operating system software for the Mac®; server software and related solutions; professional application software; and consumer, education and business oriented application software. The Company also designs, develops and markets to Mac and Windows users its family of iPod® digital music players and its iPhone™ mobile communication device, along with related accessories and services including the online distribution of third-party content through the Company's iTunes Store™. The Company's primary products are discussed below.

*Hardware Products*
The Company offers a range of personal computing products including desktop and notebook computers, server and storage products, related devices and peripherals, and various third-party hardware products. The Company's Mac desktop and portable systems feature Intel microprocessors, the Company's Mac OS X Version 10.5 Leopard™ ("Mac OS X Leopard") operating system that became available in October 2007 and iLife® suite of software for creation and management of digital photography, music, movies, DVDs, and website. The Company's transition from PowerPC to Intel microprocessors for Mac systems was completed in August 2006, and its transition for Xserve® was completed in November 2006. There are potential risks and uncertainties associated with the transition to Intel microprocessors, which are further discussed in Item 1A of this Form 10-K under the heading "Risk Factors."

MacBook® Pro
The MacBook Pro family of notebook computers is designed for professionals and advanced consumer users. First introduced in January 2006, the MacBook Pro includes a 15-inch or 17-inch widescreen display, a built-in iSight® video camera, Front Row™ with the Apple Remote, and the MagSafe® magnetic power adapter. In June 2007, the Company updated its MacBook Pro models to include the latest Intel Core 2 Duo processors and the Nvidia GeForce 8600M GT graphics controller. MacBook Pro includes up to 4GB of 667MHz DDR2 main memory with an 800 MHz frontside bus, a Serial ATA hard drive, and a slot-loading double-layer SuperDrive®. In addition, every MacBook Pro features a 1-inch thin aluminum enclosure and includes AirPort Extreme® 802.11n wireless networking, Bluetooth 2.0+EDR, Gigabit

3

# EXHIBIT 6

Case 5:08-cv-03639-RS    Document 25-9    Filed 02/06/2008    Page 2 of 2

FILED
In the Office of the
Secretary of State of Texas

DEC 1 9 2001

Corporations Section

## ARTICLES OF ORGANIZATION
PROPERTY    OF
## DIGITAL ~~ASSETS~~ MANAGEMENT GROUP, LLC

The undersigned, acting as the sole organizer of a limited liability company under the Texas Limited Liability Company Act (the "Act"), does hereby adopt the following Articles of Organization of Digital Assets Management Group, LLC (the "Company"):

### ARTICLE I
Property

The Company's name is Digital ~~Assets~~ Management Group, LLC.

### ARTICLE II

The period of duration of the Company is perpetual.

### ARTICLE III

The purpose for which the Company is organized is the transaction of any or all lawful business for which limited liability companies may be organized under the Act.

### ARTICLE IV

The address of the Company's initial registered office in the State of Texas is 4810 Cedar Springs, Suite 200, Dallas, Texas 75219, and the name of the Company's initial registered agent at that address is Bruce T. Renouard.

### ARTICLE V

The Company shall have one initial managers. The names and addresses of the initial managers are as follows:

Bruce T. Renouard
22821 Oak Flat Road
Los Gatos, CA 95030

### ARTICLE VI

The name and address of the organizer is Bruce T. Renouard, 22821 Oak Flat Road, Los Gatos, CA 95030.

IN WITNESS WHEREOF, these Articles of Organization have been executed on December 6, 2001 by the undersigned.

SOLE ORGANIZER

BRUCE T. RENOUARD

# EXHIBIT 7

Patent Local Rules

## TABLE OF CONTENTS
## PATENT LOCAL RULES

Page

1. SCOPE OF RULES ................................................ PAT 2
    1-1. Title. ..................................................... PAT 2
    1-2. Scope and Construction. ................................... PAT 2
    1-3. Effective Date. ........................................... PAT 2

2. GENERAL PROVISIONS ....................................... PAT 3
    2-1. Governing Procedure. ...................................... PAT 3
        (a) Initial Case Management Conference. ..................... PAT 3
        (b) Further Case Management Conferences. ................... PAT 3
    2-2. Confidentiality. ........................................... PAT 4
    2-3. Certification of Initial Disclosures. ......................... PAT 4
    2-4. Admissibility of Disclosures. ............................... PAT 4
    2-5. Relationship to Federal Rules of Civil Procedure. ............ PAT 4

3. PATENT INITIAL DISCLOSURES ................................ PAT 6
    3-1. Disclosure of Asserted Claims and Preliminary Infringement Contentions.
        ............................................................ PAT 6
    3-2. Document Production Accompanying Disclosure. ................ PAT 6
    3-3. Preliminary Invalidity Contentions. ......................... PAT 7
    3-4. Document Production Accompanying Preliminary Invalidity Contentions.
        ............................................................ PAT 8
    3-5. Disclosure Requirement in Patent Cases for Declaratory Judgment.
        ............................................................ PAT 8
        (a) Invalidity Contentions If No Claim of Infringement. ......... PAT 8
        (b) Applications of Rules When No Specified Triggering Event.
        ............................................................ PAT 8
        (c) Inapplicability of Rule. ................................... PAT 9
    3-6. Final Contentions. ......................................... PAT 9
    3-7. Amendment to Contentions. ................................. PAT 9
    3-8. Willfulness. .............................................. PAT 9

4. CLAIM CONSTRUCTION PROCEEDINGS ......................... PAT 11
    4-1. Exchange of Proposed Terms and Claim Elements for Construction.
        ............................................................ PAT 11
    4-2. Exchange of Preliminary Claim Constructions and Extrinsic Evidence.
        ............................................................ PAT 11
    4-3. Joint Claim Construction and Prehearing Statement. ........... PAT 11
    4-4. Completion of Claim Construction Discovery. .................. PAT 12
    4-5. Claim Construction Briefs. .................................. PAT 12
    4-6. Claim Construction Hearing. ................................. PAT 13

**PAT 1**

# PATENT LOCAL RULES

## 1. SCOPE OF RULES

### 1-1. Title.

These are the Local Rules of Practice for Patent Cases before the United States District Court for the Northern District of California. They should be cited as "Patent L.R. __."

### 1-2. Scope and Construction.

These rules apply to all civil actions filed in or transferred to this Court which allege infringement of a utility patent in a complaint, counterclaim, cross-claim or third party claim, or which seek a declaratory judgment that a utility patent is not infringed, is invalid or is unenforceable. The Court may accelerate, extend, eliminate, or modify the obligations or deadlines set forth in these Patent Local Rules based on the circumstances of any particular case, including, without limitation, the complexity of the case or the number of patents, claims, products, or parties involved. If any motion filed prior to the Claim Construction Hearing provided for in Patent L.R. 4-6 raises claim construction issues, the Court may, for good cause shown, defer the motion until after completion of the disclosures, filings, or ruling following the Claim Construction Hearing. The Civil Local Rules of this Court shall also apply to these actions, except to the extent that they are inconsistent with these Patent Local Rules.

### 1-3. Effective Date.

These Patent Local Rules shall take effect on January 1, 2001 and shall apply to any case filed thereafter and to any pending case in which more than 9 days remain before the Initial Disclosure of Asserted Claims required by former Civil L.R. 16-7 must be made. The parties to any other pending civil action shall meet and confer promptly after January 1, 2001, for the purpose of determining whether any provision in these Patent Local Rules should be made applicable to that case. No later than 7 days after the parties meet and confer, the parties shall file a stipulation setting forth a proposed order that relates to the application of these Patent Local Rules. Unless and until an order is entered applying these Patent Local Rules to any pending case, the Civil Local Rules previously applicable to pending patent cases shall govern.

**PAT 2**

Patent Local Rules

## 2.  GENERAL PROVISIONS

**2-1.  Governing Procedure.**

(a)  **Initial Case Management Conference.** When the parties confer with each other pursuant to FRCivP 26(f), in addition to the matters covered by FRCivP 26, the parties must discuss and address in the Case Management Statement filed pursuant to FRCivP 26(f) and Civil L.R. 16-9, the following topics:

(1)  Proposed modification of the deadlines provided for in the Patent Local Rules, and the effect of any such modification on the date and time of the Claim Construction Hearing, if any;

(2)  Whether the Court will hear live testimony at the Claim Construction Hearing;

(3)  The need for and any specific limits on discovery relating to claim construction, including depositions of witnesses, including expert witnesses;

(4)  The order of presentation at the Claim Construction Hearing; and

(5)  The scheduling of a Claim Construction Prehearing Conference to be held after the Joint Claim Construction and Prehearing Statement provided for in Patent L.R. 4-3 has been filed.

(b)  **Further Case Management Conferences.**  To the extent that some or all of the matters provided for in Patent L.R. 2-1 (a)(1)-(5) are not resolved or decided at the Initial Case Management Conference, the parties shall propose dates for further Case Management Conferences at which such matters shall be decided.

Patent Local Rules

## 2-2. Confidentiality.

If any document or information produced under these Patent Local Rules is deemed confidential by the producing party and if the Court has not entered a protective order, until a protective order is issued by the Court, the document shall be marked "confidential" or with some other confidential designation (such as "Confidential – Outside Attorneys Eyes Only") by the disclosing party and disclosure of the confidential document or information shall be limited to each party's outside attorney(s) of record and the employees of such outside attorney(s). If a party is not represented by an outside attorney, disclosure of the confidential document or information shall be limited to one designated "in house" attorney, whose identity and job functions shall be disclosed to the producing party 5 court days prior to any such disclosure, in order to permit any motion for protective order or other relief regarding such disclosure. The person(s) to whom disclosure of a confidential document or information is made under this local rule shall keep it confidential and use it only for purposes of litigating the case.

## 2-3. Certification of Initial Disclosures.

All statements, disclosures, or charts filed or served in accordance with these Patent Local Rules must be dated and signed by counsel of record. Counsel's signature shall constitute a certification that to the best of his or her knowledge, information, and belief, formed after an inquiry that is reasonable under the circumstances, the information contained in the statement, disclosure, or chart is complete and correct at the time it is made.

## 2-4. Admissibility of Disclosures.

Statements, disclosures, or charts governed by these Patent Local Rules are admissible to the extent permitted by the Federal Rules of Evidence or Procedure. However, the statements or disclosures provided for in Patent L.R. 4-1 and 4-2 are not admissible for any purpose other than in connection with motions seeking an extension or modification of the time periods within which actions contemplated by these Patent Local Rules must be taken.

## 2-5. Relationship to Federal Rules of Civil Procedure.

Except as provided in this paragraph or as otherwise ordered, it shall not be a legitimate ground for objecting to an opposing party's discovery request (e.g., interrogatory, document request, request for admission, deposition question) or declining to provide information otherwise required to be disclosed pursuant to FRCivP 26(a)(1) that the discovery request or disclosure requirement is premature in light of, or otherwise conflicts with, these Patent Local Rules. A party may object, however, to responding to the following categories of discovery requests (or decline to provide information in its initial disclosures under FRCivP 26(a)(1)) on the ground that they are premature in light of the timetable provided in the Patent Local Rules:

**PAT 4**

**Patent Local Rules**

**(a)**  Requests seeking to elicit a party's claim construction position;

**(b)**  Requests seeking to elicit from the patent claimant a comparison of the asserted claims and the accused apparatus, product, device, process, method, act, or other instrumentality;

**(c)**  Requests seeking to elicit from an accused infringer a comparison of the asserted claims and the prior art; and

**(d)**  Requests seeking to elicit from an accused infringer the identification of any opinions of counsel, and related documents, that it intends to rely upon as a defense to an allegation of willful infringement.

Where a party properly objects to a discovery request (or declines to provide information in its initial disclosures under FRCivP 26(a)(1)) as set forth above, that party shall provide the requested information on the date on which it is required to provide the requested information to an opposing party under these Patent Local Rules, unless there exists another legitimate ground for objection.

**PAT 5**

# 3. PATENT INITIAL DISCLOSURES

## 3-1. Disclosure of Asserted Claims and Preliminary Infringement Contentions.

Not later than 10 days after the Initial Case Management Conference, a party claiming patent infringement must serve on all parties a "Disclosure of Asserted Claims and Preliminary Infringement Contentions." Separately for each opposing party, the "Disclosure of Asserted Claims and Preliminary Infringement Contentions" shall contain the following information:

(a) Each claim of each patent in suit that is allegedly infringed by each opposing party;

(b) Separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware. This identification shall be as specific as possible. Each product, device, and apparatus must be identified by name or model number, if known. Each method or process must be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process;

(c) A chart identifying specifically where each element of each asserted claim is found within each Accused Instrumentality, including for each element that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function;

(d) Whether each element of each asserted claim is claimed to be literally present or present under the doctrine of equivalents in the Accused Instrumentality;

(e) For any patent that claims priority to an earlier application, the priority date to which each asserted claim allegedly is entitled; and

(f) If a party claiming patent infringement wishes to preserve the right to rely, for any purpose, on the assertion that its own apparatus, product, device, process, method, act, or other instrumentality practices the claimed invention, the party must identify, separately for each asserted claim, each such apparatus, product, device, process, method, act, or other instrumentality that incorporates or reflects that particular claim.

## 3-2. Document Production Accompanying Disclosure.

With the "Disclosure of Asserted Claims and Preliminary Infringement Contentions," the party claiming patent infringement must produce to each opposing party or make available for inspection and copying:

(a)  Documents (e.g., contracts, purchase orders, invoices, advertisements, marketing materials, offer letters, beta site testing agreements, and third party or joint development agreements) sufficient to evidence each discussion with, disclosure to, or other manner of providing to a third party, or sale of or offer to sell, the claimed invention prior to the date of application for the patent in suit.  A party's production of a document as required herein shall not constitute an admission that such document evidences or is prior art under 35 U.S.C. § 102;

(b)  All documents evidencing the conception, reduction to practice, design, and development of each claimed invention, which were created on or before the date of application for the patent in suit or the priority date identified pursuant to Patent L.R. 3-1(e), whichever is earlier; and

(c)  A copy of the file history for each patent in suit.

The producing party shall separately identify by production number which documents correspond to each category.

## 3-3.  Preliminary Invalidity Contentions.

Not later than 45 days after service upon it of the "Disclosure of Asserted Claims and Preliminary Infringement Contentions," each party opposing a claim of patent infringement, shall serve on all parties its "Preliminary Invalidity Contentions" which must contain the following information:

(a)  The identity of each item of prior art that allegedly anticipates each asserted claim or renders it obvious.  Each prior art patent shall be identified by its number, country of origin, and date of issue.  Each prior art publication must be identified by its title, date of publication, and where feasible, author and publisher.  Prior art under 35 U.S.C. § 102(b) shall be identified by specifying the item offered for sale or publicly used or known, the date the offer or use took place or the information became known, and the identity of the person or entity which made the use or which made and received the offer, or the person or entity which made the information known or to whom it was made known.  Prior art under 35 U.S.C. § 102(f) shall be identified by providing the name of the person(s) from whom and the circumstances under which the invention or any part of it was derived.  Prior art under 35 U.S.C. § 102(g) shall be identified by providing the identities of the person(s) or entities involved in and the circumstances surrounding the making of the invention before the patent applicant(s);

(b)  Whether each item of prior art anticipates each asserted claim or renders it obvious. If a combination of items of prior art makes a claim obvious, each such combination, and the motivation to combine such items, must be identified;

**PAT 7**

**(c)**  A chart identifying where specifically in each alleged item of prior art each element of each asserted claim is found, including for each element that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function; and

**(d)**  Any grounds of invalidity based on indefiniteness under 35 U.S.C. § 112(2) or enablement or written description under 35 U.S.C. § 112(1) of any of the asserted claims.

## 3-4.  Document Production Accompanying Preliminary Invalidity Contentions.

With the "Preliminary Invalidity Contentions," the party opposing a claim of patent infringement must produce or make available for inspection and copying:

**(a)**  Source code, specifications, schematics, flow charts, artwork, formulas, or other documentation sufficient to show the operation of any aspects or elements of an Accused Instrumentality identified by the patent claimant in its Patent L.R. 3-1(c) chart; and

**(b)**  A copy of each item of prior art identified pursuant to Patent L.R. 3-3(a) which does not appear in the file history of the patent(s) at issue.  To the extent any such item is not in English, an English translation of the portion(s) relied upon must be produced.

## 3-5.  Disclosure Requirement in Patent Cases for Declaratory Judgment.

**(a)  Invalidity Contentions If No Claim of Infringement.**  In all cases in which a party files a complaint or other pleading seeking a declaratory judgment that a patent is not infringed, is invalid, or is unenforceable, Patent L.R. 3-1 and 3-2 shall not apply unless and until a claim for patent infringement is made by a party.  If the defendant does not assert a claim for patent infringement in its answer to the complaint, no later than 10 days after the defendant serves its answer, or 10 days after the Initial Case Management Conference, whichever is later, the party seeking a declaratory judgment must serve upon each opposing party its Preliminary Invalidity Contentions that conform to Patent L.R. 3-3 and produce or make available for inspection and copying the documents described in Patent L.R. 3-4.  The parties shall meet and confer within 10 days of the service of the Preliminary Invalidity Contentions for the purpose of determining the date on which the plaintiff will file its Final Invalidity Contentions which shall be no later than 50 days after service by the Court of its Claim Construction Ruling.

**(b)  Applications of Rules When No Specified Triggering Event.**  If the filings or actions in a case do not trigger the application of these Patent Local Rules under the terms set forth herein, the parties shall, as soon as such circumstances become known, meet and confer for the purpose of agreeing on the application of these Patent Local Rules to the case.

(c) **Inapplicability of Rule.** This Patent L.R. 3-5 shall not apply to cases in which a request for a declaratory judgment that a patent is not infringed, is invalid, or is unenforceable is filed in response to a complaint for infringement of the same patent.

## 3-6. Final Contentions.

Each party's "Preliminary Infringement Contentions" and "Preliminary Invalidity Contentions" shall be deemed to be that party's final contentions, except as set forth below.

(a) If a party claiming patent infringement believes in good faith that (1) the Court's Claim Construction Ruling or (2) the documents produced pursuant to Patent L.R. 3-4 so requires, not later than 30 days after service by the Court of its Claim Construction Ruling, that party may serve "Final Infringement Contentions" without leave of court that amend its "Preliminary Infringement Contentions" with respect to the information required by Patent L.R. 3-1(c) and (d).

(b) Not later than 50 days after service by the Court of its Claim Construction Ruling, each party opposing a claim of patent infringement may serve "Final Invalidity Contentions" without leave of court that amend its "Preliminary Invalidity Contentions" with respect to the information required by Patent L.R. 3-3 if:

(1) a party claiming patent infringement has served "Final Infringement Contentions" pursuant to Patent L.R. 3-6(a), or

(2) the party opposing a claim of patent infringement believes in good faith that the Court's Claim Construction Ruling so requires.

## 3-7. Amendment to Contentions.

Amendment or modification of the Preliminary or Final Infringement Contentions or the Preliminary or Final Invalidity Contentions, other than as expressly permitted in Patent L.R. 3-6, may be made only by order of the Court, which shall be entered only upon a showing of good cause.

## 3-8. Willfulness.

Not later than 50 days after service by the Court of its Claim Construction Ruling, each party opposing a claim of patent infringement that will rely on an opinion of counsel as part of a defense to a claim of willful infringement shall:

(a) Produce or make available for inspection and copying the opinion(s) and any other documents relating to the opinion(s) as to which that party agrees the attorney-client or work product protection has been waived; and

**PAT 9**

**Patent Local Rules**

**(b)**  Serve a privilege log identifying any other documents, except those authored by counsel acting solely as trial counsel, relating to the subject matter of the opinion(s) which the party is withholding on the grounds of attorney-client privilege or work product protection.

A party opposing a claim of patent infringement who does not comply with the requirements of this Patent L.R. 3-8 shall not be permitted to rely on an opinion of counsel as part of a defense to willful infringement absent a stipulation of all parties or by order of the Court, which shall be entered only upon a showing of good cause.

Patent Local Rules

# 4. CLAIM CONSTRUCTION PROCEEDINGS

## 4-1. Exchange of Proposed Terms and Claim Elements for Construction.

**(a)**  Not later than 10 days after service of the "Preliminary Invalidity Contentions" pursuant to Patent L.R. 3-3, each party shall simultaneously exchange a list of claim terms, phrases, or clauses which that party contends should be construed by the Court, and identify any claim element which that party contends should be governed by 35 U.S.C. § 112(6).

**(b)**  The parties shall thereafter meet and confer for the purposes of finalizing this list, narrowing or resolving differences, and facilitating the ultimate preparation of a Joint Claim Construction and Prehearing Statement.

## 4-2. Exchange of Preliminary Claim Constructions and Extrinsic Evidence.

**(a)**  Not later than 20 days after the exchange of "Proposed Terms and Claim Elements for Construction" pursuant to Patent L.R. 4-1, the parties shall simultaneously exchange a preliminary proposed construction of each claim term, phrase, or clause which the parties collectively have identified for claim construction purposes.  Each such "Preliminary Claim Construction" shall also, for each element which any party contends is governed by 35 U.S.C. § 112(6), identify the structure(s), act(s), or material(s) corresponding to that element.

**(b)**  At the same time the parties exchange their respective "Preliminary Claim Constructions," they shall each also provide a preliminary identification of extrinsic evidence, including without limitation, dictionary definitions, citations to learned treatises and prior art, and testimony of percipient and expert witnesses they contend support their respective claim constructions.  The parties shall identify each such item of extrinsic evidence by production number or produce a copy of any such item not previously produced.  With respect to any such witness, percipient or expert, the parties shall also provide a brief description of the substance of that witness' proposed testimony.

**(c)**  The parties shall thereafter meet and confer for the purposes of narrowing the issues and finalizing preparation of a Joint Claim Construction and Prehearing Statement.

## 4-3. Joint Claim Construction and Prehearing Statement.

Not later than 60 days after service of the "Preliminary Invalidity Contentions," the parties shall complete and file a Joint Claim Construction and Prehearing Statement, which shall contain the following information:

**PAT 11**

(a) The construction of those claim terms, phrases, or clauses on which the parties agree;

(b) Each party's proposed construction of each disputed claim term, phrase, or clause, together with an identification of all references from the specification or prosecution history that support that construction, and an identification of any extrinsic evidence known to the party on which it intends to rely either to support its proposed construction of the claim or to oppose any other party's proposed construction of the claim, including, but not limited to, as permitted by law, dictionary definitions, citations to learned treatises and prior art, and testimony of percipient and expert witnesses;

(c) The anticipated length of time necessary for the Claim Construction Hearing;

(d) Whether any party proposes to call one or more witnesses, including experts, at the Claim Construction Hearing, the identity of each such witness, and for each expert, a summary of each opinion to be offered in sufficient detail to permit a meaningful deposition of that expert; and

(e) A list of any other issues which might appropriately be taken up at a prehearing conference prior to the Claim Construction Hearing, and proposed dates, if not previously set, for any such prehearing conference.

**4-4. Completion of Claim Construction Discovery.**

Not later than 30 days after service and filing of the Joint Claim Construction and Prehearing Statement, the parties shall complete all discovery relating to claim construction, including any depositions with respect to claim construction of any witnesses, including experts, identified in the Joint Claim Construction and Prehearing Statement.

**4-5. Claim Construction Briefs.**

(a) Not later than 45 days after serving and filing the Joint Claim Construction and Prehearing Statement, the party claiming patent infringement shall serve and file an opening brief and any evidence supporting its claim construction.

(b) Not later than 14 days after service upon it of an opening brief, each opposing party shall serve and file its responsive brief and supporting evidence.

(c) Not later than 7 days after service upon it of a responsive brief, the party claiming patent infringement shall serve and file any reply brief and any evidence directly rebutting the supporting evidence contained in an opposing party's response.

**Patent Local Rules**

**4-6.  Claim Construction Hearing.**

       Subject to the convenience of the Court's calendar, two weeks following submission of the reply brief specified in Patent L.R. 4-5(c), the Court shall conduct a Claim Construction Hearing, to the extent the parties or the Court believe a hearing is necessary for construction of the claims at issue.

**PAT 13**

# EXHIBIT 8

FOCUS - 1 of 1 DOCUMENT

**COOPER BAUCK CORP., Plaintiff, v. DOLBY LABORATORIES, INC., DENON ELECTRONICS (USA), LLC, and ABT ELECTRONICS, INC., Defendants.**

**05 C 7063**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2006 U.S. Dist. LEXIS 44885*

**June 19, 2006, Decided
June 19, 2006, Filed**

**COUNSEL:** [*1] For Cooper Bauck Corp., Plaintiff: Joseph Eben Cwik, Avrum Sidney Katz, James A. Scheer, Jon P. Christensen, Walter J. Kawula, Jr., Welsh & Katz, Ltd., Chicago, IL.

For Dolby Laboratories, Inc., Defendant: Andrew Leibnitz, John L. Cooper, Lucas W. Huizar, Farella Braun & Martel LLP, San Francisco, CA; Gregory Michael Smith, John Sheldon Letchinger, Wildman, Harrold, Allen & Dixon, Chicago, IL.

For Denon Electronics (USA), LLC, Defendant: Bradley J. Hulbert, George I. Lee, Jennifer M Kurcz, Marcia M.E. Ireland, Richard A. Machonkin, McDonnell, Boehnen, Hulbert & Berghoff, Ltd., Chicago, IL.

For ABT Electronics, Inc., Defendant: James Perry Muraff, Bradley F. Rademaker, Wallenstein Wagner & Rockey, Ltd., Chicago, IL.

**JUDGES:** HON. RONALD A. GUZMAN, United States Judge.

**OPINION BY:** RONALD A. GUZMAN

**OPINION**

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendants' Dolby Laboratories, Inc. ("Dolby"), Denon Electronics (USA), LLC ("Denon"), and Abt Electronics, Inc. ("Abt") motion to transfer venue to the Northern District of California pursuant to *28 U.S.C. § 1404(a)*. For the reasons set forth herein, the Court grants defendants' motion.

[*2] **FACTS**

On December 15, 2003, Plaintiff Cooper Bauck Corp. ("Cooper Bauck") sued Dolby, Denon, and Abt for infringing *U.S. Patent No. 4,893,342* and *U.S. Patent No. 5,034,983*, both assigned to Cooper Bauck, by manufacturing, using, selling or offering to sell audio processing products embodying claimed elements to customers in the United States. (Compl. PP 9-10.) More specifically, Dolby developed and licensed the accused infringing technology to various entities including Denon. (Dolby's Br. Supp. Mot. Transfer, Ex. A, Biber Decl. PP 3, 6.) Denon, a consumer electronics manufacturer, then allegedly incorporated the accused technology into its devices, selling thousands of units throughout the United States. (*Id.*, Ex. B, Baker Decl. PP 4, 7-8.) Through the end of 2005, Denon had sold to Abt over one hundred of these devices. (*Id.* P 9.) Located at a single facility in Illinois, and doing business via a website through which it sells consumer electronics and major appliances, Abt then sold eleven of these devices to customers located in Illinois, Wisconsin, California, New Jersey, and Massachusetts from its headquarters in Illinois. (*Id.*, Ex. C, Peterson Decl. PP [*3] 8-9, 14-15.) The quantity sold to customers in Illinois is unknown. Abt sold four of these devices to customers located in the Northern District of California. (Dolby's Reply Br. Supp. Mot. Transfer, Ex. D, Peterson Decl. P 11.)

Cooper Bauck is an Illinois corporation with its principal place of business in Tempe, Arizona. (Compl. P 1.) Dolby is a Delaware corporation with its principal place of business in San Francisco, California; Denon is a New Jersey corporation with its principal place of business in Pine Brook, New Jersey; and, Abt is an Illinois corporation with its principal place of business in Glenview, Illinois. (*Id.* PP 2-4.)

## DISCUSSION

Pursuant to *28 U.S.C. § 1404(a)*, a federal district court may "for the convenience of the parties and witness and in the interest of justice . . . transfer any civil action to any other district or division where it might have been brought." *28 U.S.C. § 1404(a)*; *Coffey v. Van Dorn Iron Works, 796 F.2d 217, 219 (7th Cir. 1986)*. It is appropriate for a district court to transfer venue only where "(1) venue was proper in the transferor district, (2) venue and [*4] jurisdiction would be proper in the transferee district, and (3) the transfer will serve the convenience of the parties and the witness as well as the interest of justice." *United Air Lines, Inc. v. Mesa Airlines, Inc. 8 F. Supp. 2d 796, 798 (N.D. Ill. 1998)*. Because determining whether to transfer venue "involves a large degree of subtlety and latitude," and is made on a case-by-case basis, it is "committed to the sound discretion of the trial judge." *Coffey, 796 F.2d at 219*; *see Amoco Oil Co. v. Mobil Oil Corp., 90 F. Supp. 2d 958, 959 (N.D. Ill. 2000)*.

In patent cases, venue is governed by *28 U.S.C. § 1400(b)*, which provides: "Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." *28 U.S.C. § 1400(b)*. For purposes of *28 U.S.C. § 1400(b)*, a non-resident corporate defendant "shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action [*5] is commenced." *28 U.S.C. § 1391(c)*; *see VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1583-84 (Fed. Cir. 1990)*.

### I. Venue Is Proper in the Northern District of Illinois

The parties do not dispute that the Northern District of Illinois is a proper venue. [1] Defendants merely argue that the case should be transferred to the Northern District of California based on convenience and the interest of justice. Thus, the Court finds that venue is proper in this district as to all defendants.

> 1   Because defendants have moved to transfer venue before moving to dismiss for lack of personal jurisdiction or asserting lack of personal jurisdiction as an affirmative defense in their answers to the complaint, they have waived their objection to personal jurisdiction in this district. *See, e.g., Berol Corp. v. BIC Corp., 2002 U.S. Dist. LEXIS 12932, No. 02 C 559, 2002 WL 1466829, at *1 (N.D. Ill. July 8, 2002)*; *United States v. B.R. MacKay & Sons, Inc., 1986 U.S. Dist. LEXIS 31034, No. 85 C 6925, 1986 WL 13717, at *6 (N.D. Ill. Nov. 28, 1986)*.

### [*6] II. Jurisdiction and Venue Would Be Proper in the Northern District of California

Because venue in a patent action against corporate defendants exists wherever there is personal jurisdiction over those defendants, no separate venue inquiry is necessary. *Trintec Indus., Inc. v. Pedre Promotional Prods., Inc., 395 F.3d 1275, 1280 (Fed. Cir. 2005)*. Whether personal jurisdiction exists in the Northern District of California over alleged out-of-state patent infringers is an issue to be determined by precedent of the Federal Circuit, rather than that of the Ninth Circuit. *See Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564-65 (Fed. Cir. 1994)*.

A district court may exercise personal jurisdiction over an out-of-state defendant when (1) the forum state's long-arm statute allows service of process and (2) the assertion of personal jurisdiction would not violate due process. *Inamed Corp. v. Kuzmak, 249 F.3d 1356, 1359 (Fed. Cir. 2001)*. "[B] ecause California's long-arm statute is coextensive with the limits of due process, the two inquiries collapse into a single inquiry: whether jurisdiction comports with due [*7] process." *Id. at 1360*; *see CAL. CIV. PROC. CODE § 410.10 (West 2005)*.

Jurisdiction comports with due process if a defendant has sufficient minimum contacts with the forum. *Inamed, 249 F.3d at 1360*. To determine whether minimum contacts exist, the court asks whether "the defendant 'has purposefully directed his activities at residents of the forum'" (referred to as general jurisdiction) or whether "'the litigation results from alleged injuries that arise out of or relate to those activities'" (referred to as specific jurisdiction). *Id.* (quoting *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-76, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985))*. The concept of minimum contacts "protects the defendant against the burdens of litigating in a distant or inconvenient forum" and "acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)*. However, even if minimum contacts exist, the court must then determine whether assertion of personal jurisdiction is constitutionally [*8] reasonable, *i.e.*, whether litigating in the particular forum would offend "'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945))*.

As a preliminary matter, Cooper Bauck concedes that a court in the Northern District of California may properly exercise personal jurisdiction as to Dolby. (Cooper Bauck's Br. Opp'n Mot. Transfer 2; Dolby's Br. Supp. Mot. Transfer, Ex. A, Biber Decl. P 2.) Therefore,

2006 U.S. Dist. LEXIS 44885, *

the remainder of the personal jurisdiction analysis focuses on Denon and Abt.

### A. General Jurisdiction

A court may exercise general personal jurisdiction where a defendant has "continuous and systematic" contacts with the forum state even though the cause of action has no relation to those contacts. *Helicopteros Nacionalaes de Colombia, S.A. v. Hall, 466 U.S. 408, 416, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*; *LSI Indus. v. Hubbell Lighting, Inc., 232 F.3d 1369, 1375 (Fed. Cir. 2000).*

In the instant case, Denon, which is not a resident of California, conducts yearly sales visits to dozens of distributors and dealers in the Northern District of California that sell Denon products incorporating [*9] the accused infringing technology. (Dolby's Reply Br. Supp. Mot. Transfer, Ex. E, Baker Decl. P 5.) Furthermore, Denon continually solicits business from these dealers throughout each year. (*Id.*) The Court holds that through Denon's sales and solicitation of sales, it has had continuous and systematic contacts with California.

As for Abt, it has purposefully reached out to consumers within the Northern District of California by directing hundreds of promotional emails to actual and potential customers within that district. (*Id.*, Ex. D, Peterson Decl. P 8.) Through its website, Abt generated millions of dollars in revenue in each of the years 2004 and 2005 from sales made to the Northern District of California. (*Id.* PP 7-8.) This is sufficient to establish Abt's continuous and systematic contacts with California.

### B. Specific Jurisdiction

Patent infringement occurs when a party "without authority makes, uses, offers to sell or sells any patented invention." *35 U.S.C. § 271(a).* Thus, a state can assert specific jurisdiction over a defendant only if the defendant commits one of these acts in that state. *HollyAnne Corp. v. TFT, Inc., 199 F.3d 1304, 1308 (Fed. Cir. 1999).* [*10]

In the past three years, Denon has sold nearly one thousand units incorporating the accused infringing technology to distributors and dealers in the Northern District of California. (Dolby's Reply Br. Supp. Mot. Transfer, Ex. E, Baker Decl. PP 1-4.) Abt has sold at least four Denon products incorporating the accused infringing technology to customers in the Northern District of California, generating approximately $ 3,500.00 in revenue. (*Id.*, Ex. D, Peterson Decl. P 11.) Therefore, Denon and Abt are also subject to personal jurisdiction in the Northern District of California because they have sold products in that district that give rise and directly relate to Cooper Bauck's cause of action.

### C. Constitutional Reasonableness

Whether the exercise of jurisdiction is constitutionally reasonable depends on several factors: "(1) the burden on the defendant, (2) the interests of the forum State; (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several States in furthering fundamental substantive social policies." *Inamed, 249 F.3d at 1363.* [*11] "[C] ases where a defendant may defeat otherwise constitutional personal jurisdiction should be 'limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum.'" *Id.* (quoting *Akro Corp. v. Luker, 45 F.3d 1541, 1549 (Fed. Cir. 1995)*).

In this case, because the burden on Dolby, Denon and Abt is slight, California has a keen interest in the litigation in order to determine whether products being sold to its residents infringe Cooper Bauck's patent, Cooper Bauck has an interest in obtaining relief, and the resolution of the controversy in California will efficiently serve the interests of justice (as discussed below), the Court holds that litigating in the Northern District of California does not offend traditional notions of fair play and substantial justice. In light of defendants' marketing, licensing, and sale of the accused infringing technology or products that incorporate that technology in the Northern District of California, they could reasonably anticipate being haled [*12] into court there. In sum, defendants have sufficient minimum contacts with the Northern District of California such that exercise of personal jurisdiction over them comports with due process.

### III. Transfer Will Serve Convenience of Parties and Witnesses and Interests of Justice

On a motion to transfer venue, the party seeking transfer "has the burden of establishing, by reference to particular circumstances, that the transferee forum is clearly more convenient" than the transferor forum. *Coffey, 796 F.2d at 219-20.* When making a transfer determination, the court considers both the private interest of the parties and the public interest of the court. *Medi USA v. Jobst Inst., Inc., 791 F. Supp. 208, 210 (N.D. Ill. 1992).*

### A. Private Interest Factors

Factors for the court to consider in assessing private interests include: (1) the plaintiff's choice of forum, (2) the situs of the material events, (3) the relative ease and access to sources of proof, (4) the convenience of the

parties, and (5) the convenience of the witnesses. *Amoco Oil, 90 F. Supp. 2d at 960*. The Court addresses the factors in turn.

**1. Plaintiff's** [*13] **Choice of Forum and Situs of Material Events**

Generally, a plaintiff's choice of forum is provided substantial weight. *Macedo v. Boeing Co., 693 F.2d 683, 688 (7th Cir. 1982)*; *Amoco Oil, 90 F Supp. 2d at 960*; *United Air Lines, 8 F. Supp. 2d at 798*. However, deference to the plaintiff's choice of forum should be minimized where it is not the situs of material events. *R.E. Davis Chem. Corp. v. Int'l Crystal Labs., Inc., 2004 U.S. Dist. LEXIS 19396, No. 03 C 7288, 2004 WL 2191328, at *5 (N.D. Ill. Sept. 27, 2004)*; *Coleman v. Buchheit, Inc., 2004 U.S. Dist. LEXIS 4677, No. 03 C 7495, 2004 WL 609369, at *1 (N.D. Ill. Mar. 22, 2004)*. When a plaintiff's choice of forum has "relatively weak connections with the operative facts giving rise to the claim," it is afforded less deference and becomes only one of many factors to be considered by the court. *Von Holdt, 887 F. Supp. at 188*; *see Amoco Oil, 90 F. Supp. 2d at 961*; *Tech. Concepts L.P. v. Zurn Indus., 2002 U.S. Dist. LEXIS 21020, No. 02 C 5150, 2002 WL 31433408, at *3 (N.D. Ill. Oct. 31, 2002)*; *Berol, 2002 U.S. Dist. LEXIS 12932, 2002 WL 1466829, at *4*.

Here, because Abt's sale of eleven [*14] devices incorporating the accused infringing technology creates only a minimal connection with Cooper Bauck's choice of this forum, it is necessary to compare the connections of each district with the operative facts giving rise to Cooper Bauck's claim. Cooper Bauck contends that its claim is sufficiently connected to the Northern District of Illinois because Cooper Bauck is an Illinois corporation, has a registered agent in this district, licenses intellectual property from its attorneys' offices located in this district, stores relevant documents in this district, maintains financial accounts in the Central District of Illinois, has a corporate officer residing in the Central District of Illinois, and the inventions at-issue were conceived, reduced to practice, and patented in Illinois. (Cooper Bauck's Br. Opp'n Mot. Transfer 7.)

While these facts establish some connection to this district, the alleged infringement goes far beyond Abt's eleven sales from the Northern District of Illinois, and "sales alone are insufficient to establish a substantial connection to the forum if the defendant's goods are sold in many states." *Anchor Wall Sys., Inc. v. R & D Concrete Prods., Inc.,* [*15] *55 F. Supp. 2d 871, 874 (N.D. Ill. 1999)*; *see Berol, 2002 U.S. Dist. LEXIS 12932, 2002 WL 1466829, at *4*. Here, at least 22,000 units incorporating the accused infringing technology have been sold nationwide. The nature of Cooper Bauck's business operations in the Northern District of Illinois and Abt's sale

of eleven products incorporating the accused infringing technology from this district, at best, establish a minimal connection between this district and the pertinent facts giving rise to this cause of action.

Dolby, Denon and Abt argue that the Northern District of California is the situs of material events because the research, development, patenting, implementation, testing, marketing, and licensing of the accused infringing technology all occurred there. (Dolby's Br. Supp. Mot. Transfer 4.) Furthermore, Dolby's principal place of business is in the Northern District of California (Compl. P 2); Dolby licenses the accused infringing technology to more licensees in the Northern District of California than any other district (Dolby's Reply Br. Supp. Mot. Transfer, Ex. F, Biber Decl. P 3); Denon has sold to electronic retailers within the Northern District of California products that incorporate [*16] the accused infringing technology (Dolby's Br. Supp. Mot. Transfer, Ex. B, Baker Decl. P 10); and Abt has also sold to consumers within the Northern District of California at least four Denon products that incorporate the accused technology (Dolby's Reply Br. Supp. Mot. Transfer, Ex. D, Peterson Decl. P 11). Such factors are given significant weight because in patent infringement cases, "'the location of the infringer's principal place of business is often the critical and controlling consideration' because such suits 'often focus on the activities of the alleged infringer, its employees, and its documents,' rather than upon those of the plaintiff []." *Technical Concepts, 2002 U.S. Dist. LEXIS 21020, 2002 WL 31433408, at *3 (quoting Habitat Wallpaper & Blinds, Inc. v. K.T. Scott L.P., 807 F. Supp. 470, 474 (N.D. Ill. 1992))*; *Energaire Corp. v. E. S. Originals, Inc., 1999 U.S. Dist. LEXIS 17304, No. 99 C 3252, 1999 WL 1018039, at *3 (N.D. Ill. Nov. 2, 1999)*.

In sum, Cooper Bauck has chosen a forum with a rather weak connection to defendants' actions giving rise to the claim, which results in the factor weighing ever so slightly against transfer. Because the situs of material events lies [*17] predominantly in the Northern District of California, this factor weighs heavily in favor of transfer.

**2. Ease and Access to Sources of Proof**

Cooper Bauck asserts that access to sources of proof is easier in this district than in the Northern District of California because its and Abt's documents are located here and because this district is centrally located amongst licensees of Dolby's accused infringing technology, from whom Cooper Bauck will presumably subpoena documents. (Cooper Bauck's Br. Opp'n Mot. Transfer 8-9.) However, Dolby maintains that the comparative bulk of relevant documents resides in the Northern District of California, and that Dolby's listening facilities and physical equipment, which Cooper Bauck has requested to

2006 U.S. Dist. LEXIS 44885, *

inspect, cannot conveniently or logistically be moved to Illinois. (Dolby Reply Br. Supp. Mot. Trans. 9-10.) Neither Denon or Abt has engineering records or other documents in its possession, custody, or control that disclose the technical operation of the accused infringing technology. (*See* Def.'s Mot. Transfer, Ex. B, Baker Decl. P 6.)

Here again, because this is a patent case, more focus is placed on the location of defendant's activities, [*18] employees, and facilities. *Technical Concepts, 2002 U.S. Dist. LEXIS 21020, 2002 WL 31433408, at *3*. As for relevant records and documents, there is no doubt that "all relevant documents will be collected, copied, inspected and sent to the office of trial counsel" regardless of the venue. *Sch. Stuff, Inc. v. Sch. Stuff, Inc., 2001 U.S. Dist. LEXIS 23382, No. 00 C 5593, 2001 WL 558050, at *5 (N.D. Ill. May 21, 2001)*. Thus, because virtually all of the relevant non-documentary evidence resides almost wholly in the Northern District of California, this factor weighs in favor of transfer.

**3. Convenience of the Parties**

This factor concerns the "residence of the parties and their ability to bear the expense of trial in a particular forum." *Medi USA, 791 F. Supp. at 210*. Cooper Bauck maintains that this is the more convenient venue for all the parties because neither Abt nor Denon expressly state that the Northern District of California is a more convenient forum and because it would be more cost prohibitive for the smaller Cooper Bauck, rather than Dolby, to litigate this case outside its home forum. (Cooper Bauck's Br. Opp'n Mot. Transfer 11.) In contrast, Dolby argues that its home forum [*19] in the Northern District of California is the most convenient venue for all parties because Cooper Bauck's principal place of business is in Arizona. (Dolby Reply Br. Supp. Mot. Trans. 11.) Here, because at least one of the parties will be inconvenienced regardless of the forum, this factor is neutral. *See I.P. Innovation, L.L.C. v. Lexmark Int'l, Inc., 289 F. Supp. 2d 952, 955 (N.D. Ill. 2003)* ("[A] motion to transfer cannot be used simply to shift the one party's inconvenience onto another party.").

**4. Convenience of the Witnesses**

The convenience of the witnesses is often the most important factor in the venue transfer analysis. *R.E. Davis, 2004 U.S. Dist. LEXIS 19396, 2004 WL 2191328, at *6*. When considering this factor, the number of witnesses located in each district and the importance of their testimony should be considered. *Medi USA, 791 F. Supp. at 210*. Additionally, the court may consider whether the witnesses can be compelled to testify. *Id. at 211*. The party seeking the transfer must specify the key witnesses to be called and make a generalized statement of what

their testimony would include. *Technical Concepts, 2002 U.S. Dist. LEXIS 21020, 2002 WL 31433408,* [*20] *at *4*.

Cooper Bauck has identified one company, Motorola Inc., headquartered in this district, from which Cooper Bauck intends to call a potential third-party witness. (Cooper Bauck's Br. Opp'n Mot. Transfer 11.) Cooper Bauck alleges that Motorola has sold products incorporating the accused infringing technology, and therefore Cooper Bauck intends to seek records and subpoena a witness from Motorola on relevant issues. (*Id.* at 12.) However, Motorola has since disassociated itself from Freescale Semiconductor, Inc., the former Motorola division that sold such products that is now a separate entity located in Texas. (Dolby's Reply Br. Supp. Mot. Transfer 9.) Dolby has identified seven companies that are licensees of the accused infringing technology located within the subpoena power of the Northern District of California and whose employees will be called as third-party witnesses to testify as to how each of the companies used such technology. (Dolby Reply Br. Supp. Mot. Transfer, Ex. F, Biber Decl. P 2.) Thus, no third-party witnesses reside in this district, and the only third-party witnesses that have been identified reside in Texas or the Northern District of California. Accordingly, [*21] this factor favors transfer.

**B. Public Interest Factors**

Public interest factors, or interests of justice, "relate to the court's familiarity with the applicable law, the speed at which the case will proceed to trial, and the desirability of resolving controversies in their locale." *Von Holdt v. Husky Injecting Molding Sys. Ltd., 887 F. Supp. 185, 188 (N.D. Ill. 1995)*.

**1. Court's Familiarity with the Law**

Patent infringement is a question of federal law. This Court and the Northern District of California are "equally well-equipped to accommodate patent infringement cases." *See Berol, 2002 U.S. Dist. LEXIS 12932, 2002 WL 1466829, at *6*. Thus, this factor weighs neither in favor of nor against transfer.

**2. Congestion of Respective Dockets**

When considering this issue, the two most relevant statistics are the median months from filing to disposition and the median months from filing to trial. *Amoco Oil, 90 F. Supp. 2d at 962*. In the Northern District of Illinois, the median time from filing to disposition is 5.8 months and from filing to trial is 24.7 months. ADMINISTRATIVE OFFICE OF U.S. COURTS, 2005 ANNUAL REPORT OF THE DIRECTOR 188-90 tbl. [*22] C-5 (2005), *available* at http://www.uscourts.gov

/judbus2005/appendices/c5.pdf. In the Northern District of California, the median time from filing to disposition is 6.4 months and from filing to trial is 26.0 months. *Id.* In addition, Dolby argues that a recent five-year, empirical analysis of patent enforcement in the district courts shows that 71% of patent cases in the Northern District of California reach resolution prior to any significant court action, while only 53% of such cases are resolved early in the Northern District of Illinois. Kimberly A. Moore, *Forum Shopping in Patent Cases: Does Geographic Choice Affect Innovation?*, 79 N.C. L. REV. 889, 912 tbl. 5 (2001).

The Court finds the difference between the congestion of the respective courts' dockets is relatively minimal (in favor of this district) and the empirical study on patent enforcement shows that more cases are resolved earlier in the proceedings in the Northern District of California than in the Northern District of Illinois. Thus, this factor weighs neither in favor of nor against transfer.

### 3. Desirability of Resolving Controversies in Their Locale

"Resolving litigated controversies [*23] in their locale is a desirable goal of the federal courts." *Doage v. Bd. of Regents, 950 F. Supp. 258, 262 (N.D. Ill. 1997).* The controversy in patent infringement actions typically centers on where the defendant's activities occurred. *Technical Concepts, 2002 U.S. Dist. LEXIS 21020, 2002 WL 31433408, at *7.* Where an accused product is distributed and sold throughout the United States, "several states . . . share [an] interest in redressing the alleged infringement." *Id.*

In this case, it has been established that much of the alleged activities that allegedly infringed Cooper Bauck's

patent occurred in the Northern District of California, including the research, development, patenting, implementation, testing, marketing and licensing of the accused infringing technology, as well as sale of products that incorporated the accused infringing technology. While Illinois has an interest in protecting those within the state from patent infringement and in preventing infringers from operating within its boundaries, because the alleged infringing technology was sold in several states, including California, California shares Illinois' interests. As such, this factor weighs in favor [*24] of transfer to the Northern District of California.

In sum, the situs of material events, the ease and access to sources of proof, the convenience of public witnesses, and the desirability of resolving the controversy in its locale all heavily favor transferring venue. All other factors (except for plaintiff's choice of forum, which weighs slightly against transfer) remain neutral. As such, the Court finds transferring this case to the Northern District of California is appropriate.

### CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to transfer venue pursuant to *28 U.S.C. § 1404(a).* This case is hereby transferred to the U.S. District Court for the Northern District of California.

### SO ORDERED

**ENTERED**: June 19, 2006

### HON. RONALD A. GUZMAN

**United States Judge**

# EXHIBIT 9

FOCUS - 1 of 12 DOCUMENTS

**MLR, LLC, Plaintiff, v. KYOCERA WIRELESS CORPORATION; NOVATEL WIRELESS, INC.; and SIERRA WIRELESS, INC., Defendants.**

**No. 04 C 7044**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2005 U.S. Dist. LEXIS 43895*

**April 6, 2005, Decided**

**COUNSEL:** [*1] For MLR LLC, Plaintiff: Raymond P. Niro, LEAD ATTORNEY, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL; Raymond Pardo Niro, Jr., William W. Flachsbart, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL.

For Kyocera Wireless Corp., Defendant: Bryce G Chapman, David H Ben-Meir, Robert J Benson, Stuart Lubitz, Hogan & Hartson, L.L.P., Los Angeles, CA; J Pieter Van Es, Wendell Wade Harris, Banner & Witcoff, Ltd., Chicago, IL.

For Novatel Wireless Inc, Defendant: Glenn Peter Albert, Jr., LEAD ATTORNEY, Foley & Lardner, Chicago, IL; Jonathan R Spivey, Matthew Eric Martin, Foley & Lardner, Chicago, IL.

For MLR LLC, Counter Defendant: Raymond P. Niro, LEAD ATTORNEY, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL; Raymond Pardo Niro, Jr., William W. Flachsbart, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL.

For Kyocera Wireless Corp., Counter Claimant: Bryce G Chapman, David H Ben-Meir, Stuart Lubitz, Hogan & Hartson, L.L.P., Los Angeles, CA; J Pieter Van Es, Wendell Wade Harris, Banner & Witcoff, Ltd., Chicago, IL.

**JUDGES:** JOHN W. DARRAH, United States District Judge.

**OPINION BY:** JOHN W. DARRAH

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff, MLR, LLC, filed suit in the United [*2] States District Court for the Northern District of Illinois against Defendants, Kyocera Wireless Corporation ("Kyocera"), Novatel Wireless, Inc. ("Novatel"), and Sierra Wireless, Inc. ("Sierra"), alleging patent infringement. Kyocera and Novatel have moved to transfer venue to the United States District Court for the Southern District of California. Sierra was added as a Defendant after the filing of the instant Motion to Transfer Venue to the Southern District of California.

A reading of the Amended Complaint and subsequent pleadings in this case supports the following summary of the alleged conduct of the parties.

MLR is a Virginia limited liability company conducting business in Florida and Virginia. MLR is the owner of eleven patents at issue in this case. Both Kyocera and Novatel are Delaware corporations headquartered in San Diego, California. MLR alleges that Kyocera, Novatel, and Sierra infringed on its patents, causing damage to MLR. Both Kyocera and Novatel have customers throughout the world, including the Northern District of Illinois. Executives from MLR, Kyocera, and Novatel, as well as third parties, are expected to testify at trial.

Kyocera and Novatel seek to have [*3] the present case transferred to the United States District Court for the Southern District of California pursuant to *28 U.S.C. § 1404(a)*. In general, "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *28 U.S.C. § 1404(a)*. A transfer is proper if: (1) venue is proper in both the transferee and transferor courts; (2) it is for the convenience of the parties or witnesses; and (3) it is in the interest of justice. *Law Bulletin Publishing Co. v. LRP Publications, Inc., 992 F.Supp. 1014, 1017 (N.D.Ill.*

1998) (*Law Bulletin*). District courts have broad discretion to grant or deny motions to transfer, and the burden is on the moving party to establish that the transfer is warranted. *Heller Financial, Inc. v. Midwhey Powder Co., Inc., 883 F.2d 1286, 1293 (7th Cir. 1989).*

Venue is proper in both the United States District Court for the Northern District of Illinois and the United States District Court for the Northern District of California. Defendants' products [*4] have been sold in Illinois and California; both Defendants operate their businesses in California. In a patent case, venue is proper in a district if that district can exercise personal jurisdiction over the defendant. *See VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1584 (Fed. Cir. 1990)* (incorporating *28 U.S.C. § 1391(c)* into *28 U.S.C. § 1400(b)*).

When evaluating the relative convenience of the parties and witnesses, the court considers: (i) the plaintiff's initial forum choice, (ii) the convenience of the witnesses, (iii) the relative ease of access to other evidence, (iv) the situs of material events, and (v) the relative convenience of the parties in litigating in the respective forums. *Amoco Oil Co. v. Mobil Oil Corp., 90 F. Supp. 2d 958, 960 (N.D. Ill. 2000)* (*Amoco*); *Georgouses v. Natec Resources, Inc., 963 F. Supp. 728, 730 (N.D. Ill. 1997)* (*Georgouses*).

The plaintiff's initial choice of forum is usually afforded substantial deference, particularly when it is the plaintiff's home forum. *Kamel v. Hill-Rom Company, Inc., 108 F.3d 799, 802 (7th Cir. 1997)*. [*5] However, there are other factors to consider; and the weight given to the plaintiff's choice of forum can vary, depending on the circumstances of each individual case. *Georgouses, 963 F. Supp. at 730*; *Law Bulletin, 992 F. Supp. at 1017*. For example, where the plaintiff's choice of forum is not the situs of the material events, plaintiff's choice of forum is entitled less deference. *See Heller Fin., Inc. v. Riverdale Auto Parts, Inc., 713 F. Supp. 1125, 1129 (N.D. Ill. 1989).*

In the instant case, MLR chose to bring suit in the Northern District of Illinois. It has filed a previous case in this district where its lawyers are conveniently located. *See MLR, LLC v. United States Robotics Corp., 2003 U.S. Dist. LEXIS 2827, Case No. 02 C 2898 (N.D. Ill. 2003).* However, the situs of material events -- the alleged infringement of the patents -- occurred in California, where Kyocera, Novatel, and Sierra all conduct their businesses. Since deference is granted to MLR's initial forum choice, this factor weighs in favor of denying Defendants' Motion to Transfer. However, because none of the parties reside in the Northern District of Illinois and the situs of material events took place outside of Illinois, [*6] deference to MLR's choice of forum is diminished.

The convenience of the witnesses who will testify at trial is also a factor to consider in determining an appropriate forum. *Law Bulletin, 992 F. Supp. at 1018*. However, the Defendants will not be granted a transfer merely by presenting a long list of witnesses and claiming their inconvenience in testifying in the challenged forum. *Law Bulletin, 992 F. Supp. at 1018*. Courts go beyond simply looking at the number of witnesses and weighing the quality and nature of their proposed testimony. *Law Bulletin, 992 F. Supp. at 1018*. Defendants are obligated to specify particular witnesses to be called and explain the nature of their testimony. *Heller, 883 F.2d at 1293*. In order to overcome the deference to the plaintiff's forum choice on the issue of witness convenience, the defendant must show that the testimony of these particular witnesses is necessary to his case. *General Portland Cement Co. v. Perry, 204 F.2d 316, 319 (7th Cir. 1953)*. As a practical matter, it is usually assumed that witnesses within the control of the parties will appear voluntarily. [*7] Therefore, more attention should be paid to the location of the non-party witnesses and those witnesses not within the control of the parties. *Spherion Corp. v. Cincinnati Financial Corp., 183 F. Supp. 2d 1052, 1058 (N.D. Ill. 2002)* (*Spherion*).

Kyocera and Novatel's principal places of business are in California. The Defendants' principal witnesses on the patent infringement claim would be from Southern California. These witnesses are also high-level executives for Kyocera and Novatel, and their testimony is expected to be highly pertinent to the relevant issues. In their initial disclosures, Defendants have identified seventeen of their former and current employees who may have information to support their claims or defenses, as well as specific topics of which that each person is likely to have knowledge. Such topics range from marketing, product design, software, sales support, pricing, and engineering issues. In addition to these 17 individuals, 350 authors of prior art publication and patents have been identified who may have discoverable information on the sole topic of prior art. Of the approximately 350 individuals, 32 are located in Illinois, and 28 are [*8] located in California. The others are scattered throughout the world, including England, Japan, and New York. No indication has been made as to which of the 350 individuals will actually be called to testify in this case. All or none of the 32 individuals in Illinois may be called to testify. It may be impossible to be able to determine which of the 350 individuals will be called to testify until after discovery has been completed. In the absence of any indication of which of the 350 third-party individuals will actually be called to testify, the convenience of the third-party witnesses cannot accurately be measured. However, the seventten individuals named by Defendants to testify on the various topics related to the claims presented in this case are all located in Southern Califor-

2005 U.S. Dist. LEXIS 43895, *

nia. The executives for Plaintiff, who will likely testify at trial, are already traveling from New York and Florida to litigate this matter and would be required to travel whether the forum for this case is Chicago or San Diego. Thus, this factor weighs in favor of granting the Defendants' motion.

Both parties have also documented hardships that its party's witnesses would endure if the venue remained [*9] in Illinois or moved to California. However, the hardships cited by MLR, which include an argument that it is more inconvenient to travel to San Diego than Chicago from Virginia and New York, are unpersuasive. San Diego is not so removed that it is unduly more burdensome to travel there instead of to Chicago. Further, Plaintiff and their attorneys have the ability to litigate in San Diego. Kyocera and Novatel, however, have provided detailed declarations about how defending a lawsuit in Chicago would be burdensome for the operation of their businesses. As such, this factor, on balance, weighs in favor of granting the Defendants' motion.

Regarding the ease of access to other evidence, most evidence for this litigation is likely to be found in Southern California, primarily at the Defendants' principal places of business. This situs of the material events of the instant case is in Southern California. While modern technology has now made it easier and less expensive to transfer information, this factor still weighs in favor of granting Defendants' motion.

The determination that a transfer is in the interest of justice focuses on the efficient administration of the court system, as [*10] opposed to the private considerations of the litigants. *Amoco, 90 F. Supp. 2d at 961*. This includes considering: (i) the relative familiarity of the courts with the applicable law, (ii) the relation of the respective forums with the issue in the case, and (iii) the relative congestion of the court dockets. *Amoco, 90 F. Supp.2d at 961*; *Georgouses, 963 F. Supp. at 730*.

Both the Northern District of Illinois and the Southern District of California are familiar with the substantive law. Although Plaintiff argues that the Northern District of Illinois hears substantially more patent, trademark, and copyright cases than the Southern District of California, this does not mean that the Southern District

of California would be unable to properly adjudicate the claims set forth in the Amended Complaint. Accordingly, this factor weighs neither in favor of nor against a transfer.

The Southern District of California may have more of an interest in providing a forum for this lawsuit because both of the Defendant corporations are headquartered in California. Although it may be argued that Defendants' products have been sold in Illinois, there is [*11] no indication that a disproportionately large amount of those products were sold in this state. Further, Plaintiff has no office or employees in Illinois. Aside from the litigation pursued in this district, Plaintiff appears to conduct no business activities in this state.

The relative congestion of the court dockets should also be considered when weighing a transfer. In 2004, the Southern District of California had 612 filings per judge. In the same year, the Northern District of Illinois had 481 filings per judge. However, the average number of pending cases before each judge in the Southern District of California was 270 while the average number of pending cases before each judge in the Northern District of Illinois was 350 in 2004. Thus, while the Southern District of California has more filings per judge than in the Northen District of Illinois, the actual number of cases pending before each judge is less in the Southern District of California. Although Plaintiff argues that cases take longer from filing to trial in the Southern District of California than in the Northern District of Illinois, the difference cited is negligible. Thus, the relative congestion of the two court [*12] dockets weighs neither in favor nor against a transfer.

In sum, the above factors -- notably, the situs of material events, convenience of the witnesses, and location of other evidence -- weigh in favor of granting Defendants' Motion to Transfer Venue to the Southern District of California. Kyocera and Novatel's Motion for Transfer to the Southern District of California is granted.

Date: April 6, 2005

JOHN W. DARRAH

United States District Judge

FOCUS - 1 of 12 DOCUMENTS

**MLR, LLC, Plaintiff, v. KYOCERA WIRELESS CORPORATION; NOVATEL WIRELESS, INC.; and SIERRA WIRELESS, INC., Defendants.**

**No. 04 C 7044**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2005 U.S. Dist. LEXIS 43895*

**April 6, 2005, Decided**

**COUNSEL:** [*1] For MLR LLC, Plaintiff: Raymond P. Niro, LEAD ATTORNEY, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL; Raymond Pardo Niro, Jr., William W. Flachsbart, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL.

For Kyocera Wireless Corp., Defendant: Bryce G Chapman, David H Ben-Meir, Robert J Benson, Stuart Lubitz, Hogan & Hartson, L.L.P., Los Angeles, CA; J Pieter Van Es, Wendell Wade Harris, Banner & Witcoff, Ltd., Chicago, IL.

For Novatel Wireless Inc, Defendant: Glenn Peter Albert, Jr., LEAD ATTORNEY, Foley & Lardner, Chicago, IL; Jonathan R Spivey, Matthew Eric Martin, Foley & Lardner, Chicago, IL.

For MLR LLC, Counter Defendant: Raymond P. Niro, LEAD ATTORNEY, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL; Raymond Pardo Niro, Jr., William W. Flachsbart, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL.

For Kyocera Wireless Corp., Counter Claimant: Bryce G Chapman, David H Ben-Meir, Stuart Lubitz, Hogan & Hartson, L.L.P., Los Angeles, CA; J Pieter Van Es, Wendell Wade Harris, Banner & Witcoff, Ltd., Chicago, IL.

**JUDGES:** JOHN W. DARRAH, United States District Judge.

**OPINION BY:** JOHN W. DARRAH

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff, MLR, LLC, filed suit in the United [*2] States District Court for the Northern District of Illinois against Defendants, Kyocera Wireless Corporation ("Kyocera"), Novatel Wireless, Inc. ("Novatel"), and Sierra Wireless, Inc. ("Sierra"), alleging patent infringement. Kyocera and Novatel have moved to transfer venue to the United States District Court for the Southern District of California. Sierra was added as a Defendant after the filing of the instant Motion to Transfer Venue to the Southern District of California.

A reading of the Amended Complaint and subsequent pleadings in this case supports the following summary of the alleged conduct of the parties.

MLR is a Virginia limited liability company conducting business in Florida and Virginia. MLR is the owner of eleven patents at issue in this case. Both Kyocera and Novatel are Delaware corporations headquartered in San Diego, California. MLR alleges that Kyocera, Novatel, and Sierra infringed on its patents, causing damage to MLR. Both Kyocera and Novatel have customers throughout the world, including the Northern District of Illinois. Executives from MLR, Kyocera, and Novatel, as well as third parties, are expected to testify at trial.

Kyocera and Novatel seek to have [*3] the present case transferred to the United States District Court for the Southern District of California pursuant to *28 U.S.C. § 1404(a)*. In general, "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *28 U.S.C. § 1404(a)*. A transfer is proper if: (1) venue is proper in both the transferee and transferor courts; (2) it is for the convenience of the parties or witnesses; and (3) it is in the interest of justice. *Law Bulletin Publishing Co. v. LRP Publications, Inc., 992 F.Supp. 1014, 1017 (N.D.Ill.*

1998) (*Law Bulletin*). District courts have broad discretion to grant or deny motions to transfer, and the burden is on the moving party to establish that the transfer is warranted. *Heller Financial, Inc. v. Midwhey Powder Co., Inc., 883 F.2d 1286, 1293 (7th Cir. 1989).*

Venue is proper in both the United States District Court for the Northern District of Illinois and the United States District Court for the Northern District of California. Defendants' products [*4] have been sold in Illinois and California; both Defendants operate their businesses in California. In a patent case, venue is proper in a district if that district can exercise personal jurisdiction over the defendant. *See VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1584 (Fed. Cir. 1990)* (incorporating *28 U.S.C. § 1391(c)* into *28 U.S.C. § 1400(b)*).

When evaluating the relative convenience of the parties and witnesses, the court considers: (i) the plaintiff's initial forum choice, (ii) the convenience of the witnesses, (iii) the relative ease of access to other evidence, (iv) the situs of material events, and (v) the relative convenience of the parties in litigating in the respective forums. *Amoco Oil Co. v. Mobil Oil Corp., 90 F. Supp. 2d 958, 960 (N.D. Ill. 2000)* (*Amoco*); *Georgouses v. Natec Resources, Inc., 963 F. Supp. 728, 730 (N.D. Ill. 1997)* (*Georgouses*).

The plaintiff's initial choice of forum is usually afforded substantial deference, particularly when it is the plaintiff's home forum. *Kamel v. Hill-Rom Company, Inc., 108 F.3d 799, 802 (7th Cir. 1997).* [*5] However, there are other factors to consider; and the weight given to the plaintiff's choice of forum can vary, depending on the circumstances of each individual case. *Georgouses, 963 F. Supp. at 730*; *Law Bulletin, 992 F. Supp. at 1017*. For example, where the plaintiff's choice of forum is not the situs of the material events, plaintiff's choice of forum is entitled less deference. *See Heller Fin., Inc. v. Riverdale Auto Parts, Inc., 713 F. Supp. 1125, 1129 (N.D. Ill. 1989).*

In the instant case, MLR chose to bring suit in the Northern District of Illinois. It has filed a previous case in this district where its lawyers are conveniently located. *See MLR, LLC v. United States Robotics Corp., 2003 U.S. Dist. LEXIS 2827, Case No. 02 C 2898 (N.D. Ill. 2003).* However, the situs of material events -- the alleged infringement of the patents -- occurred in California, where Kyocera, Novatel, and Sierra all conduct their businesses. Since deference is granted to MLR's initial forum choice, this factor weighs in favor of denying Defendants' Motion to Transfer. However, because none of the parties reside in the Northern District of Illinois and the situs of material events took place outside of Illinois, [*6] deference to MLR's choice of forum is diminished.

The convenience of the witnesses who will testify at trial is also a factor to consider in determining an appropriate forum. *Law Bulletin, 992 F. Supp. at 1018*. However, the Defendants will not be granted a transfer merely by presenting a long list of witnesses and claiming their inconvenience in testifying in the challenged forum. *Law Bulletin, 992 F. Supp. at 1018*. Courts go beyond simply looking at the number of witnesses and weighing the quality and nature of their proposed testimony. *Law Bulletin, 992 F. Supp. at 1018*. Defendants are obligated to specify particular witnesses to be called and explain the nature of their testimony. *Heller, 883 F.2d at 1293*. In order to overcome the deference to the plaintiff's forum choice on the issue of witness convenience, the defendant must show that the testimony of these particular witnesses is necessary to his case. *General Portland Cement Co. v. Perry, 204 F.2d 316, 319 (7th Cir. 1953)*. As a practical matter, it is usually assumed that witnesses within the control of the parties will appear voluntarily. [*7] Therefore, more attention should be paid to the location of the non-party witnesses and those witnesses not within the control of the parties. *Spherion Corp. v. Cincinnati Financial Corp., 183 F. Supp. 2d 1052, 1058 (N.D. Ill. 2002)* (*Spherion*).

Kyocera and Novatel's principal places of business are in California. The Defendants' principal witnesses on the patent infringement claim would be from Southern California. These witnesses are also high-level executives for Kyocera and Novatel, and their testimony is expected to be highly pertinent to the relevant issues. In their initial disclosures, Defendants have identified seventeen of their former and current employees who may have information to support their claims or defenses, as well as specific topics of which that each person is likely to have knowledge. Such topics range from marketing, product design, software, sales support, pricing, and engineering issues. In addition to these 17 individuals, 350 authors of prior art publication and patents have been identified who may have discoverable information on the sole topic of prior art. Of the approximately 350 individuals, 32 are located in Illinois, and 28 are [*8] located in California. The others are scattered throughout the world, including England, Japan, and New York. No indication has been made as to which of the 350 individuals will actually be called to testify in this case. All or none of the 32 individuals in Illinois may be called to testify. It may be impossible to be able to determine which of the 350 individuals will be called to testify until after discovery has been completed. In the absence of any indication of which of the 350 third-party individuals will actually be called to testify, the convenience of the third-party witnesses cannot accurately be measured. However, the seventten individuals named by Defendants to testify on the various topics related to the claims presented in this case are all located in Southern Califor-

nia. The executives for Plaintiff, who will likely testify at trial, are already traveling from New York and Florida to litigate this matter and would be required to travel whether the forum for this case is Chicago or San Diego. Thus, this factor weighs in favor of granting the Defendants' motion.

Both parties have also documented hardships that its party's witnesses would endure if the venue remained [*9] in Illinois or moved to California. However, the hardships cited by MLR, which include an argument that it is more inconvenient to travel to San Diego than Chicago from Virginia and New York, are unpersuasive. San Diego is not so removed that it is unduly more burdensome to travel there instead of to Chicago. Further, Plaintiff and their attorneys have the ability to litigate in San Diego. Kyocera and Novatel, however, have provided detailed declarations about how defending a lawsuit in Chicago would be burdensome for the operation of their businesses. As such, this factor, on balance, weighs in favor of granting the Defendants' motion.

Regarding the ease of access to other evidence, most evidence for this litigation is likely to be found in Southern California, primarily at the Defendants' principal places of business. This situs of the material events of the instant case is in Southern California. While modern technology has now made it easier and less expensive to transfer information, this factor still weighs in favor of granting Defendants' motion.

The determination that a transfer is in the interest of justice focuses on the efficient administration of the court system, as [*10] opposed to the private considerations of the litigants. *Amoco, 90 F. Supp. 2d at 961*. This includes considering: (i) the relative familiarity of the courts with the applicable law, (ii) the relation of the respective forums with the issue in the case, and (iii) the relative congestion of the court dockets. *Amoco, 90 F. Supp.2d at 961*; *Georgouses, 963 F. Supp. at 730*.

Both the Northern District of Illinois and the Southern District of California are familiar with the substantive law. Although Plaintiff argues that the Northern District of Illinois hears substantially more patent, trademark, and copyright cases than the Southern District of California, this does not mean that the Southern District

of California would be unable to properly adjudicate the claims set forth in the Amended Complaint. Accordingly, this factor weighs neither in favor of nor against a transfer.

The Southern District of California may have more of an interest in providing a forum for this lawsuit because both of the Defendant corporations are headquartered in California. Although it may be argued that Defendants' products have been sold in Illinois, there is [*11] no indication that a disproportionately large amount of those products were sold in this state. Further, Plaintiff has no office or employees in Illinois. Aside from the litigation pursued in this district, Plaintiff appears to conduct no business activities in this state.

The relative congestion of the court dockets should also be considered when weighing a transfer. In 2004, the Southern District of California had 612 filings per judge. In the same year, the Northern District of Illinois had 481 filings per judge. However, the average number of pending cases before each judge in the Southern District of California was 270 while the average number of pending cases before each judge in the Northern District of Illinois was 350 in 2004. Thus, while the Southern District of California has more filings per judge than in the Northen District of Illinois, the actual number of cases pending before each judge is less in the Southern District of California. Although Plaintiff argues that cases take longer from filing to trial in the Southern District of California than in the Northern District of Illinois, the difference cited is negligible. Thus, the relative congestion of the two court [*12] dockets weighs neither in favor nor against a transfer.

In sum, the above factors -- notably, the situs of material events, convenience of the witnesses, and location of other evidence -- weigh in favor of granting Defendants' Motion to Transfer Venue to the Southern District of California. Kyocera and Novatel's Motion for Transfer to the Southern District of California is granted.

Date: April 6, 2005

JOHN W. DARRAH

United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically with the Clerk of Court and served by operation of the Court's electronic filing system to those attorneys of record with an email address indicated, this 6th day of February, 2008:

Paul A. Lesko, Esq.
plesko@simmonscooper.com
Stephen C. Smith, Esq.
ssmith@simmonscooper.com
Katharine A. Wark, Esq.
SIMMONSCOOPER LLC
707 Berkshire Boulevard
Post Office Box 521
East Alton, IL  62024

*Attorneys for Plaintiff Digital Background Corporation*

       /s/ James F. Valentine      
       JAMES F. VALENTINE